[No. S019773. July 9, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
BRENDA SUE OTTO et al., Defendants and Appellants.

## COUNSEL

Laurance S. Smith and Mark L. Christiansen, under appointments by the Supreme Court, for Defendants and Appellants.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, John H. Sugiyama, Assistant Attorney General, Stan M. Helfman, Martin S. Kaye, Ronald E. Niver and Morris Beatus, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARABIAN, J.**—Joe Otto's distrust of his younger wife, Brenda Sue, bordered on the obsessive; his anxieties derived mainly from her uncertain relationship with another man, Marvin Elmer Mark. To confirm his suspicions, Joe secretly tape-recorded Brenda's telephone calls from the family residence. These recordings captured a conversation between Brenda and her suspected paramour which added a new and horrifying dimension to Joe's fears; the illicit alliance was a reality, but its object was not merely his wealth and marriage, it was his life itself.

Joe's concerns proved to be well founded. Within 48 hours of the recorded conversation, he was found dead—bludgeoned to death in his own home. Shortly thereafter, the police discovered the secret recording and several other taped conversations. Brenda and Marvin Mark were charged and tried

for first degree murder. A jury returned guilty verdicts against both defendants; each received a prison sentence of 25 years to life.

Prior to trial, both defendants moved to suppress the taped conversations on the grounds that Joe Otto had obtained them in violation of Title III of the Omnibus Crime Control and Safe Street Act of 1968 (18 U.S.C. §§ 2510-2520) (hereafter Title III or the Act) and that their introduction into evidence would therefore violate the exclusionary provision of the Act (18 U.S.C. § 2515). The trial court denied the pretrial motion and subsequently denied a renewed motion to suppress the tapes at the start of trial. ▮▮▮ The Court of Appeal affirmed the trial court's rulings, holding that suppression was not compelled under federal or state law.[1]

We granted review limited to the issue of the admissibility of the telephone conversations secretly recorded by the victim.[2] For the reasons set forth below, we conclude that under Title III the contents of the tapes could not properly be introduced into evidence. Because of the critical role played by the tapes at trial, we further conclude that the error requires reversal of the judgments of conviction.

FACTS

Joe Otto was a 61-year-old electrician with a history of heart disease when, in September of 1986, he married Brenda Sue Delwiche, a 39-year-old divorced woman with two grown children. Brenda was Joe's third wife.

The couple's relationship was troubled from the start. Their courtship of the previous year and brief marriage were marked by jealousy and suspiciousness on Joe's part, and cold-blooded calculation on the part of Brenda. She confided to a friend that she agreed to the marriage only because Joe was sick and probably would not live long; the marriage would provide financial security for herself and her daughters. Indeed, before she would agree to marry Joe, Brenda had apparently demanded a substantial cash payment, which she planned to invest with Marvin Mark.

Mark's involvement with Brenda dated from August 1985, when he became a boarder in her home. He soon became her lover and they were

---

[1]Although defendants relied exclusively on federal law at trial, the Court of Appeal also considered defendants' state law claims based on the California Privacy Act (Pen. Code, §§ 631, 632). State law, however, cannot be less protective than the federal Act. (*United States v. McKinnon* (1st Cir. 1983) 721 F.2d 19, 21, fn. 1.) Because we conclude that suppression is compelled under Title III, we need not address the issues raised by the parties concerning California law.

[2]We subsequently solicited and received supplemental briefing on the question of prejudicial error.

engaged in late 1985. The marriage plans were dropped, however, because of financial problems. Mark was an enrolled agent licensed to do income tax work. He shared an office with another enrolled agent in Santa Clara and did overload work in lieu of rent. Throughout the period in question, he complained of money problems.

In early September 1986, Joe gave Brenda a check for $10,000. The check was immediately funneled to Mark, who thereupon spent the money on a new office in Campbell and paid off certain debts. Shortly thereafter, Joe and Brenda were married in Hawaii. Within days of their return, Brenda began to speak of obtaining a divorce. She complained of Joe's possessiveness and jealousy. By the middle of October, she told her daughter that one way or another—by death or divorce—the marriage would end and she might then marry Mark.

About a week after they returned from Hawaii, Brenda learned that Joe was using a telephone answering machine to record her conversations. Indeed, even before they were married, Joe had frequently recorded his telephone conversations with Brenda so that, as he explained to his daughter Jolynn, he could later review and analyze them for contradictions. A friend showed Brenda how to unplug the answering machine from the telephone line. Unbeknownst to Brenda, however, the secret taping continued from a voice-activated recorder which Joe had hidden under Jolynn's bed. The machine recorded every call that came in or out of the house.

On the afternoon of Monday, October 13, 1986, Joe approached his neighbor, Scott Kennedy, a San Jose police officer, and asked him to listen to a particular tape. The tape contained the whispering voices of a man and a woman whom Joe identified as Brenda and Mark. The so-called "whispering tape," which was played for the jury at trial, begins with Brenda asking, "Why?" and a male voice responding, "Everything was wrong." The male then refers to a "party across the street," to "stuff all over the street with the sheets on" which "must have somebody watching," and to an "accident" on the corner. Brenda then explains, "It's the garage sale." The male states, "I tried every possible way," and asks where Brenda is calling from. When she says "home" the male expresses concern but Brenda reassures him, "I learned how to unplug it." Later in the conversation the male states, "I got a better plan." Throughout the call, the male refers to Brenda as "honey" and closes with, "Love you baby."[3]

The various references in the tape place the time of the telephone call at late Saturday night, October 11, when a neighborhood party was occurring;

---

[3]A transcription of the entire conversation, which was introduced at trial, reads as follows: "M—Hello. ¶ F—Mark . . . [¶] M—Yea. [¶] F—Why? ¶ M—What happened? [¶] F—How

items from a garage sale that Joe and Brenda held that day were still outside covered with sheets; and an accident which occurred at 11:10 p.m. that evening was not cleared until midnight.

After he talked to Kennedy on Monday, Joe also played the tape for his daughter Jolynn, who lived with Joe and Brenda and worked the night shift as a psychiatric technician at a state hospital. They tried to understand what the conversation meant. Joe told her that it was made Saturday night after he had gone to bed. Jolynn informed her father that she found the door unlocked on Sunday morning when she returned from work; Joe recalled that he had locked the door before going to bed. Concerned about the call, Jolynn asked her father to keep his gun nearby. Joe took her advice, retrieved his gun from a hiding place in the kitchen and placed it in his jacket pocket.

More telephone conversations were recorded the next day, Tuesday, October 14, although it is unclear whether Joe ever heard them. One involved a call from Brenda to Mark. In it Mark asked whether Jolynn was going to work that night; Brenda assured him that she was. Mark then states that he had "picked up a set of wheels to try out and see what it looks like. Trade cars, whatever." Mark indicated that he would be at the office until 7 p.m. and would be at home until "about 9:30 or so. Any changes, let me know." The conversation ended with each expressing love for the other.[4]

Late that afternoon, Joe and Jolynn left the house for an appointment. Before leaving, Joe handed his daughter an envelope containing his will and asked her to put it in a safe place. The will left Jolynn all of Joe's property

---

come? ¶ M—Everything was wrong . . . the party across the street . . . Inaudible . . . (possible . . . Drove up and down a couple of times.) Stuff all over the street with the sheets on . . . uh, you know made the lights brighter. I said, 'What the hell's goin' on, people gonna leave that out there and must have somebody watching or something, I couldn't figure it out.' [¶] F—It's the garage sale. [¶] M—Huh? [¶] F—It's the garage sale. [¶] M—I know it's the garage sale. But I couldn't figure a guy like leaving it out there and not having somebody watching it . . . you know. [¶] F—No. [¶] M—I tried every way possible. Where you at? [¶] F—Home. [¶] M—Oh no, you're calling from the house. [¶] F—Yea. I learned how to unplug it . . . [¶] M—Huh? [¶] F—I learned how to unplug it. [¶] M—Oh, you did. Okay, we got to talk, honey. Can you get to me sometime later? [¶] F—Yes. [¶] M—I'll be home. I'll stay home all day. You just get a hold of me, okay? I got a better plan. I'm sorry, honey. Just . . . you know . . . there was no way. Was the accident still on the corner when you guys got home? Huh? [¶] F—No. [¶] M—Was it later? What time did you get home? [¶] F—About ten to twelve. [¶] M—It just happened over there so ( inaudible). Well, do whatever you have to do to get a hold of me. [¶] F—Okay. [¶] M—Okay. [¶] F—Okay. [¶] M—Okay. Love you baby. [¶] F—Alright. [¶] M—Bye, bye."

[4] The reference on the tape to Mark having "picked up a set of wheels" was given significance by the testimony of a car salesman. Mark had done some bookkeeping for the dealership. The salesman recalled that Mark had borrowed a car from the dealer around Tuesday, October 14, 1986. At the time, Mark already owned two cars in working order.

and gave Brenda one dollar.[5] On their way home, Jolynn told her father that Brenda had been asking about her work schedule. To prevent anything from happening to Joe, they concocted a plan to have Jolynn tell Brenda that she planned to return home early from work that night. Joe also promised that he would confront Brenda the next day, Wednesday. Although when they left the house the doors were locked and the dog was in the yard, when they returned, at 6:45 p.m., they found the doors wide open and the dog running loose in the house.

Alarmed, Joe checked the house with his gun but found nothing. Later, Jolynn mentioned to Brenda that she intended to leave work early that evening. Brenda appeared visibly upset by the news. Jolynn left the house at 7:30 p.m. She did not return home early. When she finally did, her father was dead.

Joe's death was discovered early the next morning, Wednesday, when Brenda appeared at the doorstep of the Ottos' neighbor, Scott Kennedy. When Kennedy let her in, she was naked and screaming that "you have to help Joe. I think they have killed him or he's hurt. Somebody has broken in." Brenda's hands were tied behind her back with a terrycloth belt. Kennedy's wife, Kim, untied her bindings and wrapped Brenda in a blanket; she did not observe any blood or marks on Brenda's hands or arms, other than what appeared to be a rug burn on her right forearm. Both Kennedys detected the odor of semen.

Brenda explained that she and Joe had fallen asleep while watching television. She awoke with the feeling of "stuff" on her face and the presence of two people hurting Joe. In recounting this tale, Brenda seemed upset but was not crying. The first police officer on the scene obtained a report from Brenda that two Latino men had broken into the home and possibly killed Joe. In a second statement, also at the Kennedy house, Brenda stated that a large Latino man had come out of nowhere and stood next to Joe. She then heard a loud noise and simultaneously felt something sprayed on her face. She tried to run but the intruder struck her on the side of her face. A second man grabbed her housecoat, ripped off her bra, and knocked her into a wrought iron fixture, following which she passed out. She regained consciousness to find her hands tied behind her back and her ankles bound with pantyhose. She eventually untied her feet and went to the Kennedy house.

The officers who entered the Otto residence found Joe dead on the floor of the family room. The lights and television were off. An afghan partially

---

[5]Joe's total estate amounted to $300,000.

covered the body. The autopsy disclosed that Joe had died of "massive" head injuries from a "forceful trauma." The pathologist attributed the injuries to three to five blows to the head. The injuries were consistent with the use of an elongated, blunt instrument, such as a bat, two-by-four or jack handle. There was no evidence of "defensive wounds."

Once Kennedy informed the police of his conversation with Joe and the existence of the "whispering tape," the investigation focused on Brenda. A taped interview was conducted, two parts of which were played to the jury. In the first part, Brenda is tearful and describes her marriage as "good," "not a bad relationship." In the second part, the interrogating officer informs Brenda about the whispering tape and asks her whether she had ever discussed killing Joe on the phone. After a long pause, Brenda responds, "No—I don't think so." Pressed further, Brenda denied the existence of such a discussion. She was arrested that morning. A medical examination revealed no injuries to her face and no evidence that she had been struck. Particles like dried flowers were found on her chest, back and pubic area; these were consistent with dried flowers found on the floor of the murder scene.

The investigation next focused on Mark. In a taped statement he acknowledged that he and Brenda had been lovers, but stated that they had not had sex since September. He claimed that his last telephone conversation with Brenda was Sunday or Monday, when they talked about the deposit on the house they had shared. He stated that he was at his office all day Tuesday until 8 p.m., returned home by 8:45, and worked at home until about midnight; he then took his dog out in his pickup for a run, returning about 1 a.m. He saw and heard no one. Confronted with the "whispering" conversation, he conceded that it had occurred but could not recall what it was about.

The crime scene investigator noted a number of anomalies. He found no evidence of forced entry into the house, no drawers pulled open, clothes strewn about, mattresses moved or jewelry missing. The victim still had money on him. An expert in blood splatter analysis noted that it was peculiar that Brenda's pantyhose, robe and bra were found with bloodstains all around them, but none underneath. He also observed that the pattern of blood splatters was inconsistent with Brenda's account of the attack.

Neither Brenda nor Mark testified at trial.

DISCUSSION

1. *Title III—Background*

As noted earlier, defendants moved unsuccessfully to suppress the tapes as having been made in violation of Title III. The trial court denied the motion, and the Court of Appeal affirmed the trial court's ruling.

Title III provides a "comprehensive scheme for the regulation of wiretapping and electronic surveillance." (*Gelbard* v. *United States* (1972) 408 U.S. 41, 46 [33 L.Ed.2d 179, 186, 92 S.Ct. 2357].)[6] The Act makes it unlawful for any person to intercept or endeavor to intercept any wire, oral, or electronic communication "[e]xcept as otherwise specifically" permitted by other provisions of the statute. (18 U.S.C. § 2511(1)(a).) Willful disclosure of the contents of communications by a person who knows or has reason to know that the information was obtained through an unlawful interception is also forbidden. (18 U.S.C. § 2511(1)(c).)

The exceptions to Title III's blanket proscription against electronic wiretapping and surveillance are contained in 18 United States Code section 2511(2). Subdivision (d) of that section provides that it shall not be unlawful for a person to intercept a communication where "such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception . . . ." In other words, the Act prohibits third party nonconsensual intercepts; one party may record a conversation without the knowledge or consent of the other, or may authorize another to do so. However, other than duly authorized law enforcement officers, third parties may not engage in nonconsensual surreptitious wiretapping except under extremely limited circumstances not applicable here. (18 U.S.C. § 2511(2).)

The enumerated exceptions define the only circumstances in which surreptitious electronic surveillance is permissible under the Act. "Unless there is a specific section of the statute which excepts a particular interception, all willful interceptions of wire and oral communications are prohibited by the Act." (*U.S.* v. *Underhill* (6th Cir. 1987) 813 F.2d 105, 107; see also *United States* v. *Giordano* (1974) 416 U.S. 505, 514 [40 L.Ed.2d 341, 353, 94 S.Ct. 1820] ["The purpose of the [Act] . . . was effectively to prohibit, on the pain of criminal and civil penalties, all interceptions of oral and wire communications, except those specifically provided for in the Act . . . ."].)

In addition to imposing a criminal penalty for unauthorized interceptions or disclosure of information obtained through such interceptions (18 U.S.C. § 2511(1)(a)), the Act creates a damage remedy for any person whose wire or oral communications have been unlawfully intercepted, disclosed or used.

---

[6]Like the high court, we occasionally use the general terms "wiretapping" and "electronic surveillance" interchangeably to refer generally to conduct prohibited by the Act. We also use the phrases "domestic" or "spousal" wiretapping with the understanding that the phraseology is imperfect; as here, the target of the snooping usually involves parties other than family members. (See *Kratz* v. *Kratz* (E.D.Pa. 1979) 477 F.Supp. 463, 468, fn. 10.)

(18 U.S.C. § 2520.) More importantly for our purposes here, the Act also provides a *suppression* sanction. Title 18, United States Code, section 2515 (hereafter section 2515) states: "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

 ▮ Thus, a violation of the federal statute renders the illegally obtained evidence inadmissible in state court proceedings. (*State* v. *Politte* (1982) 136 Ariz.Ct.App. 117 [664 P.2d 661, 670].) The Act, in effect, establishes minimum standards for the admissibility of evidence procured through electronic surveillance; state law cannot be less protective of privacy than the federal Act. (*United States* v. *McKinnon, supra,* 721 F.2d at p. 21, fn. 1; *Pulawski* v. *Blais* (R.I. 1986) 506 A.2d 76, 77.)

 ▮ The Act also provides the means for invoking the suppression sanction. "Any aggrieved person in any trial, hearing, or proceeding in or before any court . . . of the United States, a State or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—[¶] (i) the communication was unlawfully intercepted . . . ." (18 U.S.C. § 2518(10)(a).) The Act defines an "aggrieved person" as one "who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed." (18 U.S.C. § 2510(11).)

As parties to the taped conversations, both defendants here clearly meet the statutory definition of "aggrieved person." Therefore, defendants had standing to move for suppression pursuant to 18 United States Code section 2518(10).

Furthermore, it is well settled that a telephone conversation is a "wire communication" within the meaning of Title III (*United States* v. *Axselle* (10th Cir. 1979) 604 F.2d 1330, 1334; *United States* v. *Harpel* (10th Cir. 1974) 493 F.2d 346, 349) and that the tape recording of such conversations constitutes an "intercept" under the Act. (*United States* v. *Turk* (5th Cir. 1976) 526 F.2d 654; 18 U.S.C. § 2510(4).)[7] It is also undisputed that none of the recordings at issue here was obtained by duly authorized law enforcement officers, and that neither defendant was aware of or consented to the

---

[7]It is noteworthy that Title III draws a distinction between "oral" and "wire" communications. The latter contains no requirement that the communication be made under circum-

recordings. Accordingly, the tapes do not fall within any of enumerated exceptions to the Act's broad proscription against interceptions of wire communications.

A plain reading of the Act, therefore, leads to the inescapable conclusion that defendants' conversations were unlawfully recorded, and should not have been received in evidence under the strict injunction of Title III. (18 U.S.C. §§ 2515, 2518.)

The Attorney General nevertheless asserts that the conversations were properly admitted under two separate theories: (1) that they were lawfully intercepted under an implied exception to Title III for "interspousal" or "domestic" wiretapping; and (2) that even assuming they were unlawfully obtained, Title III does not compel suppression where the government is merely the innocent recipient, rather than the procurer, of the illegally intercepted communication. We address each of these contentions in turn.

### 2. *Interspousal Wiretapping*

■ The Attorney General's threshold contention is that the defendants' conversations were lawfully recorded by the victim under an implied exception to Title III's comprehensive ban on surreptitious wiretapping. In essence, the government contends that Title III does not prohibit a family member from wiretapping a family phone. Because the wiretap here was directed at one spouse by another and was accomplished within the marital home, the Attorney General contends that it was not unlawful and, therefore, that suppression was not required under section 2515.

The Attorney General's claim runs counter to the plain language of the Act, which states that "any person" who engages in electronic surveillance is liable to punishment or subject to suit "[e]*xcept as otherwise specifically*

---

stances justifying an expectation of privacy. (18 U.S.C. § 2510(1).) An "oral" communication, on the other hand, is expressly defined as a communication "uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation . . . ." (18 U.S.C. § 2510(2); see *Matter of John Doe Trader Number One* (7th Cir. 1990) 894 F.2d 240, 242-243.) Thus, a telephone call which is intercepted by means of an illegal wiretap "is . . . protected by Title III regardless of whether the participants actually have any justifiable expectations of privacy." (Fishman, *The Interception of Communications Without a Court Order: Title III, Consent, and the Expectation of Privacy* (1976) 51 St.Johns L.Rev. 41, 61-62; see *Kratz v. Kratz, supra,* 477 F.Supp. at pp. 472-473; cf. *People v. Siripongs* (1988) 45 Cal.3d 548, 564 [247 Cal.Rptr. 729, 754 P.2d 1306] [defendant whose telephone conversation was overheard by police officer standing within three feet of defendant "could not have justifiably expected his conversation was not being intercepted, because he could clearly see that at least one police officer could hear every word he said."].)

*provided."* (18 U.S.C. § 2511(1).) No exception is specifically provided for family members or for interspousal or "domestic" wiretaps. Thus, the government essentially asks this court to create a new, unenumerated exception to the Act for interspousal wiretapping.

That request cannot be squared with the Supreme Court's pronouncement that, "Except as *expressly* authorized in Title III, . . . *all* interceptions of wire and oral communications are flatly prohibited." (*Gelbard* v. *United States, supra,* 408 U.S. at p. 46 [33 L.Ed.2d at p. 186], italics added.) As the high court has explained, "The purpose of the [Act] . . . was effectively to prohibit . . . *all* interceptions of oral and wire communications, *except those specifically provided for in the Act* . . . ." (*United States* v. *Giordano, supra,* 416 U.S. at p. 514 [40 L.Ed.2d at p. 353], italics added; see also *U.S.* v. *Underhill, supra,* 813 F.2d at p. 107 ["Unless there is a specific section of the statute which excepts a particular interception, all willful interceptions of wire and oral communications are prohibited by the Act."].)

The plain language and the high court's pronouncements notwithstanding, the Attorney General contends that the legislative history of Title III reveals a congressional intent to exempt domestic wiretapping from the Act's comprehensive ban on nonconsensual electronic surveillance. ■ This argument overlooks the settled rule that courts will not refer to extrinsic sources when a statute is clear and unambiguous on its face. (See *Caminetti* v. *United States* (1917) 242 U.S. 470, 485 [61 L.Ed. 442, 453, 37 S.Ct. 192] ["Where the language is plain, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion."]; accord *Gemsco, Inc.* v. *Walling* (1945) 324 U.S. 244, 260 [89 L.Ed. 921, 933, 65 S.Ct. 605]; *United States* v. *Oregon* (1961) 366 U.S. 643, 648 [6 L.Ed.2d 575, 579, 81 S.Ct. 1278].) ■ Accordingly, no further analysis is necessary to determine that the surreptitious, third party wiretap perpetrated here was unlawful under Title III.

Even if we look behind the text of the Act, as the government urges, our conclusion remains unaltered. Indeed, contrary to the claims of the Attorney General, the history of Title III reveals an unmistakable congressional intent to prohibit *all* unauthorized electronic surveillance, including domestic wiretapping.

Congress enacted Title III after extensive legislative hearings had disclosed widespread abuse of electronic surveillance. (See Comment (1977) 27 Buffalo L.Rev. 139, 140, fn. 5.) These abuses were not solely or even primarily occurring in the public sphere, but rather the private domain, particularly in the areas of domestic relations and commercial espionage.

Appearing before the Senate Judiciary committee, Professor Robert Blakey, widely credited as the author of Title III (see *United States* v. *Giordano, supra*, 416 U.S. at pp. 517-518, fn. 7 [40 L.Ed.2d at pp. 354-355]), testified as follows: "[P]rivate bugging in this country can be divided into two broad categories, commercial espionage and marital litigation." (Hearings on the Right to Privacy Act of 1967 Before the Subcommittee on Administrative Practice & Procedure of the Senate Judiciary Committee, 90th Cong., 1st Sess., pt. II at p. 413, quoted in *United States* v. *Jones* (6th Cir. 1976) 542 F.2d 661, 669; see also Comment, *supra*, 27 Buffalo L.Rev. at p. 142, fn. 18.)

Numerous statements by other witnesses and legislators during the Senate hearings demonstrate that Congress was keenly aware of the problem of interspousal surveillance. (See Comment, *supra*, 27 Buffalo L.Rev. at pp. 142-143; see also Note, (1978) 12 Val. U.L.Rev. 537, 541-542; Comment (1975) 7 U. Tol. L.Rev. 185, 201-205.) As one federal court has observed: "The legislative history [of Title III] abounds with expressions of congressional consensus on the lack of justification for private electronic surveillance, . . ." particularly in the domestic context. (*United States* v. *Jones, supra*, 542 F.2d at p. 671, fn. 19.)[8]

The Senate committee report that accompanied Title III explicitly identified the problem which the legislation was designed to address as the increasingly widespread private surveillance into "each man's personal, *marital*, religious, political, or commercial concerns. . . ." (Sen. Rep. No. 1097, 90th Cong., 2d Sess. 225, reprinted in 1968 U.S. Code Cong. & Admin. News, at pp. 2117, 2154, italics added.) Such abuses, the report

---

[8]Congress held a number of hearings beginning in 1965 as part of an ongoing legislative effort to revise federal law on electronic surveillance. This process culminated in the enactment of Title III of the Omnibus Crime Control and Safe Streets Act of 1968. (A list of the congressional hearings can be found in Comment, *supra*, 27 Buffalo L.Rev. at p. 140, fn. 5.)

During the hearings, Senator Long, Chairman of the Subcommittee on Administrative Practice and Procedure of the Senate Judiciary Committee, noted that the three major areas in which private electronic surveillance was widespread were " '(1) industrial (2) divorce cases, and (3) politics. So far, we have heard no real justification for continuance of snooping in these three areas.' " (Hearings on Invasion of Privacy Before the Subcommittee on Administrative Practice & Procedure of the Senate Judiciary Committee, 89th Cong., 1st Sess., pt. 5 at p. 2261 (1965-1966), quoted in *United States* v. *Jones, supra*, 542 F.2d at p. 668, fn. 12; see also *Kratz* v. *Kratz, supra*, 477 F.Supp. at p. 471.) The subcommittee also heard testimony from the District Attorney of Dade County, Florida, indicating that domestic wiretapping was routine procedure in marital disagreements (Hearings, *supra*, pt. II, at p. 1009), as well as the testimony of several private investigators indicating that electronic surveillance was a common technique in domestic relations investigations. (*Id.*, pt. 5, at pp. 2262, 2365, 2411, cited in *United States* v. *Jones, supra*, 542 F.2d at p. 668, fn. 12; *Kratz* v. *Kratz, supra*, 477 F. Supp. at p. 471.) For other passages from the legislative record illustrating a congressional awareness of the problem of domestic wiretapping, see *United States* v. *Jones, supra*, 542 F.2d at pages 668-669, footnotes 12, 14, 15, and 16.

continued, could, no longer be condoned. "Virtually all concede that the use of wiretapping or electronic surveillance techniques by *private unauthorized hands* has little justification where communications are intercepted without the consent of one of the participants." (*Id.* at p. 2156, italics added.) Indeed, a cosponsor of the Act, Senator Hruska, stated that the Act imposes a "broad prohibition . . . on private use of electronic surveillance, particularly in *domestic relations* and industrial espionage situations." (*Id.* at p. 2274, italics added.)

Thus, there can be no doubt that Congress was fully aware of the prevalence of domestic wiretapping, and intended to prohibit the practice by virtue of the Act's comprehensive ban on nonconsensual electronic surveillance.[9] The legal writers who have examined the congressional record are nearly unanimous on this point. As one author observes: "Although Congress made certain specific exclusions from liability under the statutes, it did not specifically exclude spouses. The legislative history leaves no doubt that Title III was designed to prohibit private unauthorized electronic surveillance, and that Congress was aware that a major area for use of such surveillance was the preparation of domestic relations litigation." (Note (1979) 12 Creighton L.Rev. 1209, 1227.)

Another legal commentator has concluded: "Congress intended that [interspousal surveillance] should be entirely prohibited. This sense of Congress is indicated in the debate, the legislative history, the wording of the statute, and in the opinion of the author of Title III." (Comment, *supra*, 7 U. Tol. L.Rev. 185, 203-204.)

These views are widely shared. (See, e.g., Comment, *supra*, 27 Buffalo L.Rev. at p. 143 ["It can and ought to be inferred . . . that since Congress was aware of the prevalence of wiretapping domestic relations, its failure to exclude this area from the Act's broad prohibitions was deliberate."]; Note, *supra*, 12 Val. U.L.Rev., at p. 539 [". . . Congress did intend to include interspousal electronic surveillance within the scope of Title III . . . ."]; Comment (1972) 11 Ga.L.Rev. 427, 434 ["The language of Title III is not ambiguous, and the legislative history supports a literal interpretation of the statute's broad prohibition against interception of oral or wire communications . . . . The failure of Congress to include interspousal surveillance among the express exceptions to Title III was therefore intentional."]; but cf. Note (1989) 57 Fordham L.Rev. 1035.)

---

[9]The Senate report states that the Act "establishes a blanket prohibition against the interception of any wire communication." (Sen. Rep. No. 1097, 1968 U.S.Code Cong. & Admin. News, *supra*, at p. 2180.) Also, the report explains that the definition of "person" in 18 United States Code section 2510(6) "is intended to be comprehensive." (*Id.* at p. 2179.)

In light of the Act's plain language and equally plain history, the overwhelming majority of courts that have considered the issue have also concluded that Title III's penalties and prohibitions apply to domestic surveillance. (*Heggy* v. *Heggy* (10th Cir. 1991) 944 F.2d 1537, cert. den. (1992) __ U.S. __ [117 L.Ed.2d 651, 112 S.Ct. 1514]; *Kempf* v. *Kempf* (8th Cir. 1989) 868 F.2d 970; *Pritchard* v. *Pritchard* (4th Cir. 1984) 732 F.2d 372; *United States* v. *Jones, supra,* 542 F.2d 661; *Nations* v. *Nations* (W.D.Ark. 1987) 670 F.Supp. 1432; *Flynn* v. *Flynn* (N.D.Ohio 1983) 560 F.Supp. 922; *Heyman* v. *Heyman* (N.D.Ill. 1982) 548 F.Supp. 1041: *Gill* v. *Willer* (W.D.N.Y. 1980) 482 F.Supp. 776; *Kratz* v. *Kratz, supra,* 477 F.Supp. 463; *Turner* v. *PV Intern. Corp.* (Tex.Ct.App. 1988) 765 S.W.2d 455; *Ex Parte O'Daniel* (Ala. 1987) 515 So.2d 1250; *Pulawski* v. *Blais, supra,* 506 A.2d 76; *Rickenbaker* v. *Rickenbaker* (1976) 290 N.C. 373 [226 S.E.2d 347]; *Stamme* v. *Stamme* (Mo.Ct.App. 1979) 589 S.W.2d 50; see also *Campiti* v. *Walonis* (1st Cir. 1979) 611 F.2d 387, 391-392 [58 A.L.R. Fed 579].) In addition, a number of courts have held that state wiretap statutes modeled on the federal Act provide no exception for domestic surveillance. (*Ransom* v. *Ransom* (1985) 235 Ga. 656 [324 S.E.2d 437]; *Pica* v. *Pica* (1979) 70 App.Div.2d 931 [417 N.Y.S.2d 528, 530]; *Burgess* v. *Burgess* (Fla. 1984) 447 So.2d 220, 222; *State* v. *Jock* (Del. 1979) 404 A.2d 518.)

*Pritchard* v. *Pritchard, supra,* 732 F.2d 372, is representative of the extensive case law on the subject. After careful consideration of the text, the legislative history, the relevant decisional law and the commentaries, the federal court concluded: "[W]e find that Title III prohibits all wiretapping activities unless specifically excepted. There is no express exception for instances of willful, unconsented to electronic surveillance between spouses. Nor is there any indication in the statutory language or in the legislative history that Congress intended to imply an exception to facts involving interspousal wiretapping." (*Id.* at p. 374.)

*United States* v. *Jones, supra,* 542 F.2d 661, is equally instructive: "Our review of the legislative history of this section, testimony at congressional hearings, and debates on the floor of Congress, inescapably lead to the conclusion that 18 U.S.C. § 2511(1)(a) establishes a broad prohibition on all private electronic surveillance and that a principal area of congressional concern was electronic surveillance for the purposes of marital litigation." (*Id.* at p. 669.)

One federal Court of Appeals has concluded that the Act does not prohibit a spouse from intercepting the telephone conversations of the other spouse. In *Simpson* v. *Simpson* (5th Cir. 1974) 490 F.2d 803, cert. den. (1974) 419 U.S. 897 [42 L.Ed.2d 141, 95 S.Ct. 176], a wife filed a civil damage suit

against her husband under Title III, alleging that the husband had used a recording device in the marital home to intercept conversations between the wife and another man. While acknowledging that the "naked language of Title III, by virtue of its inclusiveness, reaches this case," the *Simpson* court nevertheless concluded that Congress did not intend to intrude "into areas normally left to the states, those of the marital home and domestic relations." (*Id.* at p. 805.) Several subsequent decisions have uncritically accepted the so-called "spousal" exception unveiled in *Simpson.* (See *Anonymous* v. *Anonymous* (2d Cir. 1977) 558 F.2d 677; *Lizza* v. *Lizza* (E.D.N.Y. 1986) 631 F.Supp. 529; *Baumrind* v. *Ewing* (1981) 276 S.C. 350 [279 S.E.2d 359]; *Perfit* v. *Perfit* (C.D.Cal. 1988) 693 F.Supp. 851.) It was this purported exception which formed the basis of the Court of Appeal's decision herein.[10]

*Simpson's* reasoning has been subjected to severe criticism, and its holding has been repudiated by the vast majority of legal commentators and state and federal courts. The leading treatise authors, Professor James G. Carr,

[10]The spousal exception set forth in *Simpson* was narrowed somewhat in *Anonymous* v. *Anonymous, supra,* 558 F.2d 677. There, the defendant had allegedly recorded selected telephone conversations between his daughter and the plaintiff, his ex-wife. The court, relying on *Simpson,* held that the matter involved a purely domestic dispute and therefore did not violate the Act. However, the court distinguished the facts before it from a situation where the defendant spouse intercepts *all* incoming telephone calls, including the conversations of nonfamily members; the latter, the court reasoned, removes the scenario from the province of a mere domestic dispute. (*Id.* at p. 679.) The same court subsequently applied this distinction in *Citron* v. *Citron* (2d Cir. 1983) 722 F.2d 14, holding that a spouse who placed a recording device on the family telephone and recorded all incoming and outgoing calls invaded the privacy of not only her spouse but numerous other individuals, and therefore was amenable to suit under Title III. Although this case presents facts more similar to those in *Citron* than *Anonymous* (the victim here intercepted all incoming and outgoing calls), the distinction is legally meaningless. The Act, as noted, contains no exception, express or implied, for "domestic" wiretaps however narrowly defined.

Another court has distinguished *Simpson* from the situation where a family member acts with the aid of some third party, e.g., a private investigator. (*Remington* v. *Remington* (E.D.Pa. 1975) 393 F.Supp. 898.) In such a case, the court held that Title III's civil remedies are available in an action by one spouse against the other. (*Id.* at p. 901; see also *White* v. *Weiss* (8th Cir. 1976) 535 F.2d 1067.) As several courts have observed, however, the participation of a nonfamily member constitutes a "classic 'distinction without a difference.'" (*United States* v. *Jones, supra,* 542 F.2d at p. 670; accord *Kratz* v. *Kratz, supra,* 477 F.Supp. at p. 471; see also Comment, 27 Buffalo L.Rev., *supra,* at p. 146.) Under the Act it makes no difference whether the wiretap is placed by a spouse or by a third party acting at the direction of the spouse; the invasion and the illegality remain the same.

In another variant on the *Simpson* theme, the Tenth Circuit Court of Appeals has held that while the Act plainly prohibits one spouse from wiretapping the other (*Heggy* v. *Heggy, supra,* 944 F.2d 1537), it does not prohibit a custodial parent from eavesdropping on a minor child. (*Newcomb* v. *Ingle* (10th Cir. 1991) 944 F.2d 1534.) The *Newcomb* court did not articulate a principled distinction between the two cases other than to observe that the spousal situation is "qualitatively different from a custodial parent tapping a minor child's conversations within the family home." (*Id.* at pp. 1535-1536.)

Reporter for the American Bar Association Task Force on Electronic Surveillance, and Clifford Fishman, author of Wiretapping and Eavesdropping (1978), are unanimous in their condemnation. According to Professor Carr, *Simpson* and its limited progeny "disregard the straightforward legislative framework and unambiguous statutory language . . . ." (Carr, The Law of Electronic Surveillance (2d ed. 1991) § 3.6, p. 3-107.) Fishman observes that "[m]ost courts have rejected *Simpson*" and explains: "The trend is against the *Simpson* 'marital home' exception, and properly so; even assuming the creation of such an exception would be sound policy, it is clear from the language and history of Title III that Congress intended no such exception." (Fishman, Wiretapping and Eavesdropping (1991 Supp.) § 25.1, pp. 202-203, fn. omitted.)[11]

As noted, the great majority of courts have also rejected *Simpson* v. *Simpson*, *supra*, 490 F.2d 803, concluding that its holding is flatly contrary to the history, text and purposes of Title III. (*Heggy* v. *Heggy*, *supra*, 944 F.2d at p. 1540; *United States* v. *Jones*, *supra*, 542 F.2d at pp. 666-673; *Pritchard* v. *Pritchard*, *supra*, 732 F.2d at p. 374; *Kempf* v. *Kempf*, *supra*, 868 F.2d at pp. 971-973; *Nations* v. *Nations*, *supra*, 670 F.Supp. at pp. 1434-1436; *Kratz* v. *Kratz*, *supra*, 477 F.Supp. at pp. 468-475; *Turner* v. *PV Intern. Corp.*, *supra*, 765 S.W.2d at p. 470; *Ex Parte O'Daniel*, *supra*, 515 So.2d at pp. 1252-1253; *Pulawski* v. *Blais*, *supra*, 506 A.2d at p. 77, fn. 2; *Rickenbacker* v. *Rickenbacker*, *supra*, 226 S.E.2d at p. 352; *Heyman* v. *Heyman*, *supra*, 548 F.Supp. at p. 1047; *Gill* v. *Willer*, *supra*, 482 F.Supp. at p. 778; *Stamme* v. *Stamme*, *supra*, 589 S.W.2d at pp. 52-53; *State* v. *Jock*, *supra*, 404 A.2d at pp. 521-522.)

As all of these authorities have observed, *Simpson* v. *Simpson*, *supra*, 490 F.2d 803, was conspicuously flawed in several key respects. It inexplicably ignored both the clear language of the statute and the abundant legislative history demonstrating that Congress was keenly aware of the use of wiretaps in marital disputes, yet made no exception for their use. The *Simpson* court also based its decision on the doctrine of interspousal immunity, speculating that Congress did not intend to intrude into an area normally left to the states. The fallacy of this reasoning is also evident. There is no persuasive evidence that Congress intended to defer to the states in this area; on the contrary, the legislative history demonstrates that one of the goals of the Act was precisely to forbid marital wiretapping. Furthermore, as many critics of the decision have observed, state law is far from uniform on the subject of

---

[11]Professor Robert Blakey, who was instrumental in the passage of Title III, has also repudiated the holding in *Simpson*. He has written: "Title III was intended to mean what it says—no surveillance by third parties without a warrant—by cops, spouses . . . or any other relevant relations." (Quoted in Comment, *supra*, 7 Tol. L.Rev. at p. 203, fn. 85.)

interspousal immunity; numerous states have abrogated the doctrine entirely. (*United States* v. *Jones, supra,* 542 F.2d at p. 672; *Nations* v. *Nations, supra,* 670 F.Supp. at p. 1435; Comment, *supra,* 7 Tol. L.Rev. at p. 190, fn. 27; Comment, *supra,* 27 Buffalo L.Rev. at p. 153; Note, *supra,* 12 Val. L.Rev. at p. 550.) Moreover, the doctrine of interspousal immunity is designed to preserve domestic tranquility, an interest that is hardly furthered by allowing interspousal wiretapping, particularly if the evidence is then admissible in divorce proceedings. (*State* v. *Jock, supra,* 404 A.2d at p. 520; *Heyman* v. *Heyman, supra,* 548 F.Supp. at p. 1047.) As Professor Carr has observed, the "surveillance and its discovery have probably done far more harm to marital unity than could be caused by a lawsuit." (Carr, *supra,* The Law of Electronic Surveillance, § 3.6, p. 3-108.)

The *Simpson* court also relied on Title III's so-called "extension phone" exception. The Act excludes from the definition of prohibited intercept devices "any telephone . . . furnished to the subscriber or user by a communications common carrier . . . and being used . . . in the ordinary course of its business." (18 U.S.C. 2510(5)(a).) In explaining this section, one witness at the congressional hearings stated that the Act was not designed to prohibit the casual use of an extension phone to overhear a conversation of a family member.[12] As many have observed, however, there is no evidence that Congress considered systematic wiretapping to represent the use of an extension phone "in the ordinary course of business." (*United States* v. *Harpel, supra,* 493 F.2d 346, 351; *Gerrard* v. *Blackman* (N.D.Ill. 1975) 401 F.Supp. 1189; *State* v. *Shaw* (1991) 103 N.C.App. 268 [404 S.E.2d 887, 889]; *Rickenbacker* v. *Rickenbacker, supra,* 226 S.E.2d at p. 350; Comment, *supra,* 27 Buffalo L.Rev. at pp. 147-151.)[13]

The differences between casually overhearing part of a conversation on an extension phone and intentionally wiretapping all incoming and outgoing calls are substantial; the former requires the physical

---

[12]The witness's statement was as follows: "I take it nobody wants to make it a crime for a father to listen in on his teenage daughter or some such related problem. . . ." (Hearings on the Anti-Crime Program, Before Subcommittee No. 5 of the House Judiciary Com. 90th Cong., 1st Sess., at p. 989 (1967) (testimony of professor Herman Schwartz), quoted in *Kratz* v. *Kratz, supra,* 477 F.Supp. at p. 474.)

[13]Professor Carr in his treatise on electronic surveillance has observed that the Act "requires that both the installation and use of the excepted instrument be *normal.*" (Carr, *supra,* The Law of Electronic Surveillance, § 3.2(d)(1), p. 3-42.) Thus, courts must carefully "distinguish between a use which may be justifiably viewed as normal (i.e., an anxious parent's understandable overhearing of a drug abusing child's conversations)," and more extensive invasions of privacy represented by systematic electronic surveillance. (*Id.,* § 3.6, p. 3-110; see *Campiti* v. *Walonis, supra,* 611 F.2d 387 [systematic monitoring of prisoners' conversations does not constitute use of a telephone "in the ordinary course of business" under the Act].)

presence of the eavesdropper, which inherently limits the extent and frequency of the invasion; the latter, by contrast, requires no supervision, is of potentially unlimited duration, and is wholly indiscriminate. (*Lee* v. *Florida* (1968) 392 U.S. 378, 381 [20 L.Ed.2d 1166, 1170, 88 S.Ct. 2096]; *United States* v. *Jones, supra,* 542 F.2d at p. 673, fn. 24; *Kratz* v. *Kratz, supra,* 477 F.Supp. at p. 474; *State* v. *Guhl* (1976) 140 Ga.App. 23 [230 S.E.2d 22, 26]; Comment, *supra,* 7 U. Tol. L.Rev. at pp. 205-206.)[14] Whatever Congress might have intended concerning the occasional use of an extension phone by a parent, we find no evidence of a legislative intent to create a wholesale exception for systematic interspousal wiretapping.[15]

In sum, we follow a majority of the courts in declining to read into Title III an exception for interspousal or domestic wiretapping. Neither the text, the history nor the purposes of Title III permit the conclusion that defendants' conversations were lawfully intercepted.

3. *Private Wiretaps*

Having concluded that the tapes were unlawfully procured, we are bound to conclude that their use at trial was erroneous. Section 2515 provides that whenever any wire communication has been intercepted, "no part of the contents of such communication and no evidence derived therefrom may be received in evidence . . . if the disclosure of that information would be in violation of this chapter." As parties to the conversations, defendants were statutorily entitled to suppression on the ground that their communications were "unlawfully intercepted." (18 U.S.C. § 2518(10)(a)(i).)

The government contends, however, that such a literal reading of Title III would be at variance with the congressional intent; according to the Attorney

---

[14]One court has held, for example, that an employer might legitimately listen in on an employee's conversation "in the ordinary course of business" where the employer has particular suspicions about confidential information being disclosed, knows that a particular phone call is with an agent of the competitor, and eavesdrops for only so long as the call involves the type of information he fears is being disclosed. (*Briggs* v. *American Air Filter Co.* (5th Cir. 1980) 630 F.2d 414, 420; see also *Watkins* v. *L.M. Berry & Co.* (11th Cir. 1983) 704 F.2d 577, 582-584; *Burnett* v. *State* (Tex.Ct.App. 1990) 789 S.W.2d 376, 378-379.) Thus, the intercept is limited to a particular purpose, place and time; the Act does not condone the general practice of surreptitious electronic monitoring.

[15]One legal writer has examined the legislative history of Title III and concluded that there "is no evidence that any member of Congress ever acknowledged that one of the purposes of the extension phone exception was to allow a father to eavesdrop on his teenage daughter. In fact, the history of Title III suggests precisely the opposite." (Comment, *supra,* 27 Buffalo L.Rev. at p. 149.) We express no view on this question, which is not before us, other than to hold that whatever the scope of the so-called extension phone exception, it provides no authority for an implied domestic wiretap exception to the Act.

General, section 2515 is intended to deter governmental rather than private violations of Title III. Therefore it would be pointless to apply section 2515 where, as here, the government is the innocent recipient, rather than the actual procurer, of the illegally intercepted communications.

Again, the government's contention does not withstand scrutiny. Where the intent of Congress is expressed in "reasonably plain terms," a court must ordinarily treat that language as conclusive; no resort to extrinsic aids is necessary or proper. (*Griffin* v. *Oceanic Contractors, Inc.* (1982) 458 U.S. 564, 570 [73 L.Ed.2d 973, 980, 102 S.Ct. 3245]; see also *U.S.* v. *Amer. Trucking Ass'ns.* (1940) 310 U.S. 534, 542-544 [84 L.Ed. 1345, 1350-1351, 60 S.Ct. 1059] ["There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning."].)

The language of Title III is clear and unambiguous; it provides that no part of the contents of an unlawfully intercepted wire communication may be received in evidence in any proceeding before any state or federal court. (18 U.S.C. §§ 2515, 2518.) The Act draws no distinction between communications unlawfully obtained by the government and those procured unlawfully by private means. Thus, no further analysis is necessary to demonstrate that the taped conversations were inadmissible under Title III.

The government's argument also fails on its own terms, however. The legislative intent underlying Title III, and section 2515 in particular, was definitively expounded by the United States Supreme Court in *Gelbard* v. *United States, supra,* 408 U.S. 41. Quoting directly from the Senate committee report that accompanied the bill (Sen. Rep. No. 1097, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S. Code Cong. & Admin. News, at p. 2112), the high court stated that the Act has a "dual purpose[:] (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." (*Gelbard* v. *United States, supra,* 408 U.S. at p. 48 [33 L.Ed.2d at p. 187].)

The Supreme Court characterized the protection of individual privacy as the "overriding congressional concern." (*Gelbard* v. *United States, supra,* 408 U.S. at p. 48 [33 L.Ed.2d at p. 187].) That concern extended not only to the initial invasion represented by the illegal wiretap, but to subsequent invasions occasioned by the use and disclosure of the taped conversations at trial. Congress's findings make that concern clear: "[I]ntercepting devices are

being used to overhear . . . conversations made in private" and the "contents of these communications . . . are being used by public and private parties as evidence in court and administrative proceedings. . . ." (Pub.L. No. 90-351, § 801, 82 Stat. 211.)

To remedy the problem of multiple invasions resulting from subsequent disclosures at trial, Congress extended to the victims of illegal wiretaps, private or otherwise, the full panoply of statutory remedies. Chief among these, of course, is the evidentiary prohibition of section 2515, which the high court has characterized as the primary enforcement mechanism of the Act's strict limitations upon invasions of individual privacy. (*Gelbard* v. *United States*, *supra*, 408 U.S. at pp. 48-50 [33 L.Ed.2d at pp. 187-188].) As the Senate report observed: " '[Section 2515] forms an integral part of the system of limitations designed to protect privacy. Along with the criminal and civil remedies, it should serve to guarantee that the standards of the new chapter will sharply curtail unlawful interception of wire and oral communications.' " (1968 U.S. Code Cong. & Admin. News at p. 2185, quoted in *Gelbard* v. *United States*, *supra*, 408 U.S. at pp. 50-51, fn. 9 [33 L.Ed.2d at pp. 188-189].)

Congress was also concerned about the effect on the integrity of the courts of admitting illegally procured evidence. As the high court has explained, the suppression sanction of section 2515 was designed "not only to protect the privacy of communications, but also to ensure that the courts do not become *partners to illegal conduct*: the evidentiary prohibition was enacted also 'to protect the integrity of court and administrative proceedings.' " (*Gelbard* v. *United States*, *supra*, 408 U.S. at p. 51 [33 L.Ed.2d at pp. 189], quoting from the congressional findings, Pub.L. No. 90-351, *supra*, § 801, 82 Stat. 211, italics added.) It is wholly immaterial to the accomplishment of these express congressional goals whether the wiretap was perpetrated by private or governmental means.

Contrary to the claims of the Attorney General, therefore, the legislative history of Title III demonstrates that Congress was aware of the problem of private wiretapping and intended to curb its abuse by means of the suppression sanction. Any other conclusion would patently contravene the congressional injunction that "courts . . . not become partners to illegal conduct." (*Gelbard* v. *United States*, *supra*, 408 U.S. at p. 51 [33 L.Ed.2d at pp. 189].)

Numerous courts, both state and federal, have so concluded. The leading federal case is *U.S.* v. *Vest* (1st Cir. 1987) 813 F.2d 477. There, the defendant, a police detective, was indicted for making false statements before a grand jury. He moved to suppress a private recording proving that, contrary to his

statements under oath, he had accepted a bribe. The district court held that the contents of the tape must be suppressed under Title III. (*United States* v. *Vest* (D.Mass. 1986) 639 F.Supp. 899.) The Court of Appeal affirmed, rejecting the government's claim—identical to the argument here—that section 2515 is inapplicable "where the government is merely the innocent recipient, rather than the procurer, of an illegally-intercepted communication." (813 F.2d at p. 480.) As the federal court explained, section 2515's "'importance as a protection for "the victim of an unlawful invasion of privacy" could not be more clear.'" (*Id.* at p. 481, quoting *Gelbard* v. *United States, supra,* 408 U.S. at p. 50 [33 L.Ed.2d at p. 188].) That invasion is not necessarily complete when the interception occurs, the court observed, but may be compounded by subsequent disclosure in court or elsewhere. The "impact of this second invasion is not lessened by the circumstance that the disclosing party (here, the government) is merely the innocent recipient of a communication illegally intercepted by the guilty interceptor (here, Waters)." (*Ibid.*)

A similar conclusion was reached in *United States* v. *Phillips* (8th Cir. 1976) 540 F.2d 319, cert. den. (1976) 429 U.S. 1000 [50 L.Ed.2d 611, 97 S.Ct. 529]. There, as in *Vest*, the defendant was accused of perjury based on certain false statements before a grand jury. The critical evidence at trial was a conversation between defendant and two compatriots recorded by a private detective. In resolving the issue of admissibility, the court rejected the government's threshold claim that the Act did not apply where the government was merely the innocent recipient of a privately recorded conversation. As the court stated: "We also reject the government's argument . . . that the tape is independently admissible because the government had no part in the decision to record or the actual recording of the conversation. . . . [T]he fourth and fifth amendments proscribe government action, not private action. We are concerned here with a *specific statutory directive* that certain conversations which are electronically intercepted by private persons are not admissible in any official proceeding." (*Id.* at p. 327, fn. 5, italics added.)

Several state courts have also concluded that evidence derived from an unlawful private wiretap is inadmissible in a criminal prosecution. In *State* v. *Dwyer* (1978) 120 Ariz.Ct.App. 291 [585 P.2d 900], for example, the court affirmed the granting (by then Superior Court Judge Sandra Day O'Connor) of defendant's motion to suppress certain conversations overheard by a telephone operator which implicated defendant in a conspiracy to commit murder. Over a vigorous concurring opinion which conceded that the result was compelled under Title III but challenged its wisdom and called for a congressional amendment of the Act (*id.* at pp. 904-906), the Arizona court held that the conversation was unlawfully intercepted and therefore inadmissible under section 2515. (*Id.* at p. 904.)

*Com.* v. *DeBlase* (1986) 357 Pa.Super. 71 [515 A.2d 564] presents the same issue on facts strikingly reminiscent of those at bar. A wealthy real estate developer was murdered in January of 1982. Prior to his death, he secretly installed a line-activated tape recorder on his estranged wife's private telephone for use in a divorce proceeding. The recordings documented an illicit tryst between the victim's wife and her 23-year-old nephew. Based on this recording and other information, the nephew, DeBlase, was arrested and charged with murder. The trial court granted a motion to suppress the contents of the tape under the Pennsylvania Wiretap Act (18 Pa. Cons. Stat. § 5701 et seq.). Modeled in part on Title III, the Pennsylvania law contains a statutory exclusionary rule substantially similar to the federal provision. (18 Pa. Cons. Stat. § 5721 ["Except as proof in a suit or prosecution for a violation of this act, no evidence obtained as a result of an unlawful interception shall be admissible in any such proceeding . . . ."].) On appeal, the government urged that the court should create an exception to the Act where the victim rather than the government engaged in the unlawful recording. The court rejected the contention, explaining as follows: "Such an exception is not provided for in the express language of the Act nor do we find that such an exception would be in keeping with the overall structure and provisions of the Act. The communications were intercepted in violation of the Act and were properly suppressed by the trial court." (515 A.2d at p. 566.)

Florida is another state with a wiretap statute modeled on the federal Act. (*Horn* v. *State* (Fla.Dist.Ct.App. 1974) 298 So.2d 194, 197-198.) Indeed, the Florida exclusionary provision, Florida Statutes section 934.06,[16] is nearly identical in terms to section 2515. In *Horn* v. *State, supra,* 298 So.2d 194, the issue was whether the Florida statute compelled the suppression of critical evidence that placed the defendant at the scene of his wife's murder. Defendant denied guilt and adduced testimony from several witnesses supporting his alibi that he was elsewhere at the time of the killing. However, a coworker of the victim testified that she had used an extension phone to eavesdrop on a telephone call in which defendant told the victim that he would pick her up after work. She was killed shortly thereafter.

Concluding that the text and meaning of the statute were plain, the Florida court held that the eavesdropping was unlawful and the contents of the illegally overheard conversation were therefore inadmissible. (*Horn* v. *State,*

---

[16]The Florida statute provides: "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the state, or a political subdivision thereof, if the disclosure of that information would be in violation of this chapter."

*supra*, 298 So.2d at pp. 198-199.) Moreover, because the testimony relative to the intercepted conversation was highly prejudicial, the court was compelled to reverse the judgment and remand for a new trial. (*Ibid.*)[17]

In sum, neither the text, the history, nor the purposes of Title III support the government's claim that Congress intended to exempt unlawful private intercepts from the strictures of section 2515. The text of the Act is synonymous with its purpose; we may question the congressional wisdom in adopting so expansive a rule, but we may not, as the Florida Supreme Court observed, "substitute [our] judgment for that of the Legislature and create an exception which would encompass the instant circumstances." (*State* v. *Walls*, *supra*, 356 So.2d at p. 296.)

In a related argument, the Attorney General urges that section 2515 be construed as coextensive with the Federal Fourth Amendment exclusionary rule. ■ It is well settled, of course, that the latter applies only to governmental searches; it does not preclude the state from using the fruits of illegal searches and seizures by private citizens. (*United States* v. *Jacobsen* (1984) 466 U.S. 109, 113-118 [80 L.Ed.2d 85, 93-97, 104 S.Ct. 1652]; *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 487 [29 L.Ed.2d 564, 595, 91 S.Ct. 2022].) ■ The government's argument rests on a sentence in the Senate report to the effect that section 2515 was generally not intended "to press the scope of the suppression role beyond present search and seizure law." (Sen.Rep. No. 1097, *supra*, at p. 96, reprinted in 1968 U.S. Code Cong. & Admin. News at p. 2185.) Thus, the Attorney General asserts that we may infer a congressional intent to incorporate into Title III the Fourth Amendment exception for evidence unlawfully seized by a private party.

Again, the argument does not withstand scrutiny. In *United States* v. *Giordano*, *supra*, 416 U.S. 505, the United States Supreme Court emphasized that interpretation of section 2515 "does not turn on the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights, but upon the provisions of Title III," and indicated that Congress did not

---

[17]Two subsequent Florida decisions have reached similar conclusions. In *Nova* v. *State* (Fla.Dist.Ct.App. 1977) 346 So.2d 1214, the court reversed a murder conviction, holding that the wiretap statute prohibited the testimony of a coworker of the victim concerning a conversation on which she unlawfully eavesdropped. In *State* v. *Walls* (Fla. 1978) 356 So.2d 294, the Florida Supreme Court applied the same statute to hold inadmissible the tapes of several threatening telephone calls which the alleged victim had surreptitiously recorded. (Unlike the federal statute, which does not prohibit interceptions by a party to the communication, the Florida wiretap prohibits the interception "unless all of the parties to the communication have given prior consent . . . ." (Fla. Stat. § 934.03(2)(d).) As the Florida court observed: "The language of the statutes in question is clear and unambiguous, and no exception for the situation before us is provided. This Court cannot substitute its judgment for that of the Legislature and create an exception which would encompass the instant circumstances." (356 So.2d at p. 296.)

intend to make section 2515 strictly coextensive with the Fourth Amendment. (416 U.S. at pp. 524, 528 [40 L.Ed.2d at pp. 358, 360].) Indeed, section 2515 by its terms expands upon Fourth Amendment jurisprudence by making the exclusionary rule applicable across the board in all federal and state proceedings, civil, criminal, administrative, legislative, regulatory or otherwise. (See *U.S.* v. *Vest, supra,* 813 F.2d at p. 482.)

Furthermore, as several courts have observed, "Congress could not have intended the courts to disregard . . . the different policy considerations underlying the two rules." (*U.S.* v. *Vest, supra,* 813 F.2d at pp. 481, 483; accord *Horn* v. *State, supra,* 298 So.2d at p. 201.) ■■■ The primary purpose of the Fourth Amendment exclusionary rule is the deterrence of unreasonable searches and seizures in violation of the Constitution, a purpose which clearly would not be furthered by penalizing the police for a private violation. ■■■ The protection of privacy was the dominant concern of Congress in enacting section 2515 (see *Gelbard* v. *United States, supra,* 408 U.S. at p. 48 [33 L.Ed.2d at p. 187]), an interest which, as discussed previously, is served not simply by penalizing the unlawful interception, but also by prohibiting any subsequent invasion in court or elsewhere. (18 U.S.C. § 2511.) As one federal court has explained: "[U]nder Title III, unlike the Fourth Amendment, the invasion of privacy is not simply 'over and done with' when an unlawful intrusion has been effected. Rather, the disclosure or use of information obtained through such an intrusion amounts to a separate injury to the victim's privacy interest. . . . Section 2515—beyond serving the traditional exclusionary rule function of deterring future unlawful interceptions—also plays a role in protecting against the use or disclosure of communications that have been illegally seized." (*United States* v. *Dorfman* (7th Cir. 1982) 690 F.2d 1217, 1228.)

In sum, the Fourth Amendment requirement of governmental action has no application to the statutory suppression sanction of section 2515.

Finally, the Attorney General argues that the purpose of the statutory exclusionary rule is simply to sanction the perpetrator of the illegal interception, a limited goal which plainly would not be served here. The government relies on a statement in the Senate report to the effect that "the perpetrator must be denied the fruits of his unlawful actions in civil and criminal proceedings." (Sen.Rep. 1097, *supra,* at p. 69, reprinted in 1968 U.S. Code Cong. & Admin. News at p. 2156.) As discussed above, however, such a narrow reading of the congressional intent does not comport with the Act's text or legislative history. Congress sought to protect individual privacy by banning all surreptitious wiretapping (*Gelbard* v. *United States, supra,* 408 U.S. 41); that goal requires suppression of the fruits of an illegal intercept regardless of whether the perpetrator is a party to the litigation or a disinterested third party. Furthermore, it is worth recalling that section 2515

"serves not only to protect the privacy of communications, but also to ensure that courts do not become partners to illegal conduct . . . ." (408 U.S. at p. 51 [33 L.Ed.2d at pp. 188-189].) Thus, we may not countenance the use of tainted evidence derived from a private wiretap any more than we may exploit evidence procured by the government through illegal means.

The cases on which the government relies are patently inapposite. All involve either minor infractions of provisions of the Act, or taped conversations that were recorded by a party to the conversation, often the defendant himself. Thus, in *United States* v. *Chavez* (1974) 416 U.S. 562 [40 L.Ed.2d 380, 94 S.Ct. 1849], the high court permitted the use of information gathered through the use of a police wiretap despite a technical misstatement in the government's application for the wiretap, observing that violations of the Act do not require suppression if they are not significant within the congressional scheme circumscribing how the government may employ electronic surveillance. (*Id.* at pp. 574-575 [40 L.Ed.2d at pp. 391-392]; see also *United States* v. *Donovan* (1977) 429 U.S. 413, 435-437 [50 L.Ed.2d 652, 672-674, 97 S.Ct. 658].) We do not find, nor does the Attorney General seriously contend, that the surreptitious recordings at issue are analogous to the petty violations in *Chavez* and *Donovan.*

The Attorney General's reliance on *U.S.* v. *Underhill, supra,* 813 F.2d 105, *Traficant* v. *C.I.R.* (6th Cir. 1989) 884 F.2d 258, and *U.S.* v. *Nietupski* (C.D.Ill. 1990) 731 F.Supp. 881, is also misplaced. In each case, the defendants sought to suppress tape recordings of illegal activities which they or their coconspirators had themselves procured. In each case, the court refused to permit suppression—not because section 2515 was inapplicable to unlawful private interceptions—indeed, the courts assumed that the suppression sanction would otherwise normally apply, but rather because it would contravene the clear congressional purpose of Title III to allow the perpetrator to benefit from his own illegal act. (See *U.S.* v. *Underhill, supra,* 813 F.2d at p. 112 ["We think it is clear that Congress did not intend for § 2515 to shield the very people who committed the unlawful interceptions from the consequences of their wrongdoing."].) Thus, these decisions are neither pertinent nor persuasive authority.

In sum, we decline to read into the Act an exception permitting the use of evidence illegally intercepted by a private party. We may question the wisdom of Congress in adopting such a broad-based suppression sanction. We may even urge the Congress to consider an appropriate amendment to the Act which would preclude such a result in future cases. We may not, however, substitute our judgment for that of the legislature. Neither the

contents of the tape recordings nor any evidence derived therefrom was properly admissible in any of the proceedings below.[18]

### 4. *Prejudice*

The final issue to be resolved is whether the erroneous admission of the taped conversations was so prejudicial as to compel reversal of the judgments of conviction.

A review of the record reveals that the tapes played a critical role in the state's case against defendants. To be sure, the prosecution adduced substantial independent evidence of motive on the part of both defendants, and cast substantial doubt—based on the physical evidence—on Brenda's account of the events surrounding the murder. Nevertheless, it is apparent that the tapes themselves constituted the strongest evidence of motive, opportunity, planning and deliberation. The so-called whispering tape provided tangible proof of an ongoing relationship between defendants, and supported the prosecution's theory that defendants were plotting Joe's murder at least several days prior to the event. The second tape also shows planning activity by Mark, as he refers to "trad[ing] cars" and inquires of Brenda whether Jolynn, the victim's daughter, will be working the night of the murder. Although the dialogue is ambiguous and subject to interpretation, there is no doubt that the taped conversations provided the most dramatic and compelling evidence of guilt.

The centrality of the tapes was confirmed by the prosecutor in closing argument. She not only played the "whispering" tape for the jury but displayed an enlarged reproduction of the entire text of the conversation. She ridiculed defense counsel's suggestion that defendants were simply planning an innocent assignation, stating: "[The] conversations . . . can only reasonably and logically be understood to mean that Brenda and Mark were planning to kill Joe Otto. The evidence shows it, and you know it. And I know it. And the Defendants know it. Anyone who puts those conversations in context knows that they were discussions about killing Joe Otto, period, not setting up a sexual rendezvous or anything else you might be able to stretch your imagination to think of."

The prosecutor repeatedly adverted to the tapes as concrete evidence of defendants' deliberate plan to commit murder. Referring to the conversation in which Mark asks Brenda whether Joe's daughter will be working the night of the murder and makes reference to "trad[ing]" cars, the prosecutor asks:

---

[18]As several courts have concluded, there is strong evidence that Congress intended an exception to the section 2515 exclusionary rule to permit the use of unlawfully intercepted evidence for impeachment purposes. (*U.S.* v. *Vest, supra,* 813 F.2d at p. 484; *United States* v. *Winter* (1st Cir. 1981) 663 F.2d 1120; *United States* v. *Caron* (5th Cir. 1973) 474 F.2d 506.) However, that issue is not before us, and we therefore express no views on the subject.

"Can you reasonably explain away this conversation considering all the evidence as something other than a confirmation that he's going over to the Otto house later on?. . . . [¶] They have a plan there. And that's the only person Brenda has a conversation with that night that indicates this sort of action in concert."

The prosecutor also stressed Brenda's reaction when first confronted with the tapes, particularly her response when the police asked whether she had ever discussed killing her husband on the telephone: "Does Brenda say, 'Are you crazy?' Does she react with outrage? Does she say 'How dare you suggest such a thing?' . . . Brenda doesn't say either of these things. [¶] After several seconds, she says, 'No, I don't think so.' And Brenda must have been thinking to herself, 'My God, did we ever say "kill" on the phone? Didn't I turn off the tape recorder. Did that S.O.B. have another one some place? What do these people know?' "

The tapes, in short, were the linchpin of the state's case against defendants. Under any standard of error, the conclusion is inescapable that defendants' convictions must be reversed.[19]     ▉     We emphasize that reversal is premised solely upon an error of law, rather than insufficiency of the evidence. Accordingly, a retrial is not precluded by the double jeopardy clause. (*People* v. *Shirley* (1982) 31 Cal.3d 18, 71 [181 Cal.Rptr. 243, 723 P.2d 1354].)

## DISPOSITION

The decision of the Court of Appeal affirming the judgment of the trial court is reversed.

Lucas, C. J., Mosk, J., Panelli, J., Kennard, J., Baxter, J., and George, J., concurred.

Respondent's petition for a rehearing was denied August 20, 1992.

---

[19]The parties disagree as to the harmless error standard applicable to violations of the Act; defendants predictably argue that affirmance requires a finding the error was harmless beyond a reasonable doubt under *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; the state urges a reasonable probability test under the state and federal standards for nonconstitutional error. (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]; *United States* v. *McAllister* (9th Cir. 1984) 747 F.2d 1273, 1277; Fed. Rules Crim. Proc., rule 52(a); 28 U.S.C. § 2111.) There has been no definitive statement by the federal courts concerning the harmless error standard to be applied in cases involving violations of Title III. (Compare *United States* v. *Russo* (10th Cir. 1975) 527 F.2d 1051, 1057 [admission of illegally recorded conversations "was indeed harmless beyond a reasonable doubt."] with *U.S.* v. *Gomez* (5th Cir. 1990) 900 F.2d 43, 45 [the court must determine whether an erroneously admitted tape recording "affected the appellant's substantial rights . . . See Fed.R.Crim.P. 52(a)."].) We need not resolve the question here, however, for as explained above the tapes were sufficiently central to the prosecution as to be prejudicial under any standard.