100 Cal.Rptr.2d 326 (2000)
83 Cal.App.4th 1166
The PEOPLE, Plaintiff and Respondent,
v.
Christine LOYD, Defendant and Appellant.
No. A080542.
Court of Appeal, First District, Division Four.
September 28, 2000.
As Modified on Denial of Rehearing October 30, 2000.
Review Granted January 24, 2001.
*328 Jo Anne Keller, Counsel for Appellant.
Bill Lockyer, Attorney General David Druliner, Chief Assistant Attorney General Ronald A. Bass, Senior Assistant Attorney General Rene A. Chacon, Supervising Deputy Attorney General Bridget Billeter, Deputy Attorney General, Counsel for Respondent.
Certified for Partial Publication.[*]
*327 SEPULVEDA, J.
Christine Loyd was convicted by jury of two counts of first degree murder (Pen. Code, § 187)[1] and one count of arson (§ 451, subd. (c)) and was sentenced to prison for a term of 55 years to life. She alleges on appeal that the trial court committed reversible error by denying her motion to sever counts, allowing the prosecutor to cross-examine a defense witness about defendant's religious beliefs and permitting a witness to testify to hearsay statements. She further contends that the district attorney committed prosecutorial misconduct by taping some of her jail conversations and by impugning the integrity of defense counsel and referencing defendant's religious beliefs during closing argument. We find no error and affirm.

PROCEDURAL AND FACTUAL BACKGROUND
Defendant was charged by indictment with two counts of murder (counts one and two; § 187) and one count of arson (count three; § 451, subd. (c).) She entered a plea of not guilty. Subsequent motions to quash, strike or dismiss the indictment (§ 995), to sever count one from counts two and three, and to impose sanctions due to the taping of some of defendant's jail conversations, were denied. The case proceeded to jury trial and defendant was convicted of two counts of first degree murder and arson. She was sentenced to prison for 55 years to life. This timely appeal followed.

1. The Myrtle Loyd Homicide.

The murder charged in count one arose from the death of defendant's 76-year-old mother, Myrtle Loyd. On July 19, 1991, Myrtle Loyd failed to appear at her place of work, without calling in. When defendant attempted to reach Myrtle Loyd at work that afternoon, her boss expressed concern about her absence. Defendant informed him that she was out of town and that she would check on her mother when she had a chance. Defendant was in St. Helena from Friday, July 19, until Sunday July 21.
According to defendant's statements, on the morning of July 22, she went to her mother's apartment, found her mother unconscious in the bathtub, and called 911. Police officers arrived and found Myrtle Loyd dead in the bathtub, in a fetal position on her right side, her head pointing toward the faucet. Her hands were clasped to her chest. There was no water in the tub; there was blood at the water line but the officers did not see blood anywhere else. The officers did not notice any lacerations on Myrtle Loyd's head. There was no sign of forced entry and nothing appeared to have been disturbed.
Defendant told police that she found her mother's body when she came by that morning to drop off groceries. Myrtle Loyd's body was in the tub, covered with water; defendant tried to lift her mother *329 out but could not. She pulled the plug to drain the water and called the police. Defendant's demeanor was described by the police as "indifferent." She described her mother's health as poor. She did not mention that her mother worked or that her boss had expressed concern about her missing work on Friday.
The coroner's investigator transported Myrtle Loyd's body to the coroner's office. He noticed blood coming from her mouth and nose, but did not notice any head wounds. He listed the cause of death as a possible drowning. After the police left, various friends and coworkers came by Myrtle Loyd's apartment. One friend cleaned the bathtub so that defendant would not have to do it and noticed that there were three drops of blood on the front edge of the sink in the bathroom.
Among the visitors were the decedent's bosses, James Wark and Ralph Bowles. Defendant told them that her mother was standing in the bathroom in front of the mirror putting on makeup, had a stroke or heart attack, and fell into the bathtub, striking her head.
An autopsy was performed and six separate lacerations were discovered on the back of the decedent's head. One laceration was found on her forehead. The lacerations were the result of blunt head trauma caused by a long and heavy instrument. One of her fingers had been dislocated and severely bruised and there were two other bruises on her hand. These hand injuries were consistent with defensive wounds, but not consistent with a fall. According to the autopsy surgeon, Myrtle Loyd could not have received seven wounds on her head by falling down.[2] An exact time of death could not be established. Based on his examination, the autopsy surgeon felt it was possible that she died on Thursday night or Friday. She did not die as a result of a heart attack or stroke. Further, the injuries she received (whatever their cause) would have resulted in a significant amount of blood spatter. The autopsy surgeon notified the homicide division of his findings and they responded once again to the victim's apartment. Diluted blood was found on the inside of the shower door and on a small cabinet. Nondiluted blood was located on the bottom edge of the bathroom door. No one saw any blood spatter.[3] Despite all of these findings, the coroner's office finally reported the cause of death as accidental and the case was considered closed.
Defendant was periodically in financial trouble. She went into default on her mortgage in 1987 and again in 1990. She made enough back payments in January 1991 to remove the notice of default. She filed for bankruptcy in 1988. She was the sole beneficiary of one of Myrtle Loyd's pension accounts. She received over $77,000 from that account in late 1991 and early 1992. Although she deposited over $72,000 in her bank account in February 1992, by April of that year her account had a balance of only $25,953.68. On December 18, 1992, her account was overdrawn and was closed. Myrtle Loyd had previously given defendant a power of attorney on her bank account. The account was not closed upon Myrtle Loyd's death and her civil service pension checks continued to be deposited there every month. Defendant used the monthly deposits. On at least four occasions in the next three years she forged her mother's name to documents indicating that Myrtle Loyd was still alive, so that the civil service checks would continue to be deposited every month.
Defendant made statements to several people, both on the date she reported her *330 mother's death to the police and thereafter, about what had happened. No one she talked to on July 22 remembered her mentioning that her mother had missed work on Friday or that she had been trying to reach her mother that weekend. She did not tell her brother, Philip Loyd, that their mother had missed work on Friday. She never asked any of the victim's friends when they had last seen or spoken with her mother. She did not ask the apartment manager when he had last seen Myrtle Loyd, nor did she call him over the weekend to check on her. She never told her mother's friends or the police that she had been trying to reach her mother over the weekend; she did tell that to her roommate. She told her roommate specifically that she had been trying to reach her mother all weekend and went to her apartment that morning to check on her. She never told any of her mother's friends or coworkers that there was going to be, or had been, an autopsy of her mother's body. There were slight variations in the stories she told to various people about finding her mother. She told some that she went over to her mother's apartment that morning to bring groceries (and indeed grocery bags were seen in the kitchen), she told others that she went over to surprise her mother before work and to have coffee with her, and she told her roommate that she went over to check on her mother because she had been trying to reach her all weekend. Defendant did seem upset, like a grieving daughter in shock, trying to maintain control.
Defendant's brother testified that he believed his mother's death to be accidental. He was very close to his sister. He did not believe she was involved in causing their mother's death. He believed that Alan Breckstein (his mother's hairdresser) also had a key to his mother's apartment. He and defendant joked during a telephone conversation about trying to blame their mother's death on Alan. He also attempted to explain a taped telephone conversation between himself and defendant, during which they discussed the authorities being "convinced by us" that Myrtle Loyd's death was accidental, as merely a comment that the police viewed the death as an accident, just as they did. It was not an admission on their part.
It was only after the death of Virginia Baily in 1994 that the investigation into Myrtle Loyd's death was reopened.

2. The Virginia Baily Homicide and Arson.

Counts two and three arise from the death of 59-year-old Virginia Baily and the arson of her residence. In the early morning of June 25, 1994, a neighbor discovered that Virginia Baily's house was on fire. After calling the fire department, he called defendant, as he knew she was watching the home while Baily was away. Defendant then called the fire department and asked if they had found a body inside the house, indicating that Baily may have changed her mind about being away. The fire department subsequently found Baily's body face down on the floor of the dining room, under roof debris.
The area of origin of the fire was determined to be where the victim's body was located. Baily's head was approximately six feet from the fireplace. Her head was so badly burned that no analysis of possible trauma in that area could be performed. Her head was the most badly burned part of her body; the skull was burned through and the brain was burned. If there had been blunt trauma in the area where the skull was burned, it would have been destroyed by the burning there. In the areas where the scalp was burned away (which was most of the head), there could have been large lacerations the autopsy surgeon would never have been able to see. Baily's back and legs were also badly burned, but the underside of her abdomen was partially protected from burning. In the inguinal area near her thigh, living and dead maggots were found. There was evidence of decomposition on Baily's chest and abdomen. Based on *331 these findings, the coroner believed that Baily had been face down on the floor, one arm crooked, the elbow near her head, and the other arm across her face during the fire. From the maggots and the state of decomposition of the body, the time of death was fixed at no less than 48 hours before the fire. If Baily's body had been placed in a refrigerator or freezer, she could have been dead up to 12 to 13 days. The cause of death was not determined, but the autopsy surgeon was sure that she died before the fire. This opinion was based upon the fact that her body was already in a state of decomposition, with maggots present. No cyanide was present. Cyanide is produced in fires and it is frequently found in the blood of persons who have died as a result of a fire. There was also no soot or smoke in her airway, the presence of which would have been an indication that Baily was alive and inhaled smoke or soot during the fire. The fire department initially reported that they found no evidence of any accelerant which might have been used to start the fire, but they concluded that it was intentionally set, since they found no other likely cause. After reinspecting the home, they concluded that holes in the dining room floors and elsewhere indicated a hot fire and there were flammable liquid burn patterns present. The area was not cordoned off as a crime scene until July 7 or 8 and several people had had access to the house during the intervening time.
The door on Baily's refrigerator in her kitchen was not attached when the fire inspector arrived at the scene. The refrigerator was empty and the shelves removed. There were no hinges on the door or the refrigerator. Baily normally kept her refrigerator stocked with food. An employee of the refrigerator's manufacturer testified that a woman of approximately Baily's size could fit in it when the doors were removed[4], and that a fire would not cause the door to come off or melt the hinges. Additionally, Baily owned a large chest-type freezer, although evidence showed that it was full of frozen food after the fire. Both the freezer and the refrigerator were removed from the scene before they could be collected as possible evidence.
During 1993 and 1994, defendant acted as Baily's financial organizer. She had access to the victim's tax forms, checking account, and other financial information. From late 1993 to June 1994, she wrote numerous checks to herself and to her deceased mother, drawn on Baily's account. She signed Baily's name to these checks and many were written in identical, large amounts. These checks totaled over $24,000. Some of the checks were deposited into defendant's mother's account.
Starting on June 14, defendant began making purchases using Baily's Costco card, forging Baily's name on Baily's checks to pay for the items. The day before the fire, she purchased two 40-ounce cans of Kingsford lighter fluid and a 50-foot commercial hose. Two days after the fire (June 27), she made two additional purchases at Costco using Baily's name and checking account, writing the date "June 21" on both checks.
On June 14 and 18, two deposits were made to Baily's bank account. The signatures on these two deposit slips were made by the same person, who was not the person (probably Baily) who signed two deposit slips on June 11. On June 21, someone passed two checks in the amount of $96, made out to defendant with Baily's signature, at the El Cerrito branch of Mechanics Bank. The bank camera showed defendant in that branch of the bank on June 21.
In 1993, Baily was having trouble paying her mortgage. She took defendant's advice and obtained a loan where she allegedly would not have to make payments for a year and then could get another loan to *332 pay it off. Defendant convinced her that the loan was a good idea; Baily relied heavily on the advice of defendant. Baily received the loan of $100,000 in September 1993. Monthly payments were in fact due and she made them for two months, in November and December. No payments were made thereafter. In March of 1994, the lender issued a notice of default, followed by a notice of sale on June 9, 1994. The notice of sale was sent by certified mail and signed for by Baily on June 13, 1994.
During the week of June 13 through June 17, several friends and acquaintances telephoned Baily. Their calls were not returned or were returned by defendant. Defendant offered various explanations for Baily's whereabouts. On June 20, Baily missed calling her brother on his birthday. One friend had called Baily repeatedly and could not reach her; her messages went unanswered. On June 22, defendant told her that Baily was out of town. On June 23, defendant explained that Baily was attending a seminar in San Francisco. On June 17, 18, and 19 Baily did not appear for jobs, without giving notice. Employers who called her were told on various occasions by defendant that Baily was sick with laryngitis and unable to work, was attending a wedding, or was out running errands. Baily planned on going to her nephew's wedding in Salt Lake City on June 25. On June 24, defendant told the person Baily was to fly with that Baily was busy running errands all day. Baily's nephew was told by defendant on June 22 that Baily was "out of town at a seminar in the city."
Defendant told various people who called that she was caring for Baily's cats while she was gone. When one individual called Baily's house, a person identifying herself as "Christine"[5] answered and said she was caring for the cats. The neighbor across the street said he usually cared for Baily's cats when she was away.
Baily usually parked her car in front of her house or in her driveway. During the two weeks before the fire, the car was not seen in these locations, but was observed parked about two blocks away. Defendant's vehicle was seen at Baily's house between June 13 and June 17.
Defendant made statements to several people after the fire, some of which were contradictory. She spoke with the victim's brother, Richard Baily, his friend, Ana Graham, and Ann Argabrite on the Sunday after the fire. She at first told Richard Baily that she had been the victim's financial organizer and had a lot of her records at her house. She agreed to meet him the following week and hand over the records. On the day she was to meet him, she said that she had only some tax records and old canceled checks. They tried to set up two or three appointments to sit down and go over the financial records. A couple of days later she provided one document, a cancelled check for $11,000, to the victim's brother. She also provided some owner's manuals for various appliances. He did not remember if he got any tax records from her, but recalled that he did not get any other bank records from defendant.
On the Sunday following the fire, defendant told a friend of the victim, Sally Reyes, that she had last seen the victim on June 24, the Friday prior to the fire and that the victim was supposed to have been out of town when the fire occurred. Reyes heard defendant repeat this story to several other people.
The memorial service for Virginia Baily took place on the Tuesday after the fire. Defendant read a eulogy, during which she said (referring to the victim), "Friday I saw you vacuuming." After the service, defendant told James Donlin, Baily's nephew, that she had meant the previous Friday, *333 June 17, not the Friday preceding the fire. Ann Argabrite had told defendant after the service that maggots had been discovered on the victim's body (which would indicate that Baily had been dead for some time).
Donlin again spoke with defendant on the following Wednesday. She then said that she had been to the victim's house to feed the cats while Baily was out of town. She had not been inside Baily's house on the Friday before the fire (June 24). When she went there on the 24th, a note which had previously been on Baily's door saying she was at a class in San Francisco and would return Thursday, June 23, was gone. Defendant therefore assumed that Baily had returned.
Inspector Bierce of the Berkeley Police Department spoke with defendant on June 29. She told him that she believed Baily had gone to work the weekend before the fire and had then gone to a seminar early in the week of June 20. She took care of Baily's cats, as she often did, from June 18 through June 24. On Wednesday, June 22, she saw a note on Baily's door saying she was away and would return on June 23. Defendant indicated she had been at Baily's house on June 23 and June 24, but had not seen Baily. The last time she saw Baily was June 17. When she was at Baily's house on June 24, the victim's body was not there. She never mentioned that Baily had missed work or that she had been receiving calls from concerned friends and acquaintances all week. She never mentioned she had been writing checks on Baily's account.
Bierce reinterviewed defendant on July 14. She indicated that part of her job with Baily was "downsizing Baily's massive inventory of personal property."[6] Defendant said that the last time she had seen the victim was on June 15. Although she had been at Baily's home on June 17, Baily was not there. She indicated she did not go to Baily's house on June 16, but then admitted she made calls to individuals from that location on that date. She at first said she could not remember if she had been there on June 23, but later admitted making telephone calls to two individuals from that location on that date.
Regarding the morning of the fire, defendant said she called the fire department because she did not know where Baily was and because Baily had changed her plans to go to Salt Lake City for her nephew's wedding. She said that Baily drank a lot and she thought that Baily disappeared on an alcoholic binge during the week before the fire. She described problems Baily had been having with several individuals, suggesting they may have plotted to kill her. She also said that Baily was careless with fire and kept various flammable items around the house.
Finally, defendant admitted telling many different lies to various people about Baily's whereabouts. She claimed that she was just covering for Baily. She denied making one specific call, to a person named Simone, during which someone with a hoarse voice claimed to be Baily. This call, however, was made from Baily's house five minutes after a call to Ana Graham, which defendant admitted making.
When police officers Bierce and Nonoguchi went to defendant's house to interview her boyfriend, R.W. Jenkins, defendant walked into the room and said, "[t]hat's the person who accused me of killing Gini. Why are you talking to him?" When they moved outside to complete the interview, defendant yelled at Bierce, "I hope you die of AIDS."
Several days after the fire, Jane Timberlake [7] called defendant to ask for Matthew *334 Madison and Raymond McLaren's[8] telephone number, as they were now in charge of keeping the key to Baily's house. Timberlake needed to let the insurance company inspectors into the house. When Timberlake explained this to defendant, she said, "[y]ou can't let them in. You have to stop them."

3. The Defense Case.

The defense attacked the circumstantial nature of the People's case and the lack of physical evidence indicating that either victim's death was by other than natural causes. As to her mother, defendant testified that she last saw her alive on Wednesday, July 17, 1991. She spoke to her on the telephone the next day. When she was told by the receptionist at her mother's place of work that she was not there on July 19, the defendant indicated she would get someone to check on her, since she was in St. Helena over the weekend. She called Alan Breckstein and asked him to check on her, as he had a key. He was to get back to her if there was a problem. Since he never called back, she assumed everything was all right.[9] On Monday morning she brought groceries to her mother's home. She found her mother in a bathtub full of bloody water and pulled the plug as her mother's head was under the water. She called 911.
Defendant indicated that she was devoted to her mother; she did not physically fight with her, and never physically hurt her. She did not kill her. She thought her mother fell in the bathtub and struck her head on the old, pointy fixtures. Because defendant was in dire financial straits, she fooled the government into thinking her mother was still alive and continued to accept her pension checks after her death. She claimed to have no idea that she was a beneficiary of her mother's annuity until months after her death. She indicated that although she was in financial trouble when her mother died, her mother always helped her financially and she would have no reason to kill her.
As to the death of Virginia Baily, defendant denied killing her or setting fire to her house. She denied stealing from her. She had a separate pad of checks for writing checks from Baily's account, with her permission. She would write checks to herself or to Myrtle Loyd for Baily to sign. She would occasionally write checks from Baily's account to pay her own bills. This was money owed to her for work that she did for Baily. She would "launder" money for Baily, by writing checks to herself in amounts that matched standard bills such as mortgage payments. She would cash the checks and give the cash back to Baily. The intent was to let Baily accumulate wealth and hide that fact from the government. Defendant herself was in financial difficulty at this time and if she had been stealing thousands of dollars from Baily she would have paid her own mortgage.
Defendant explained that she last saw Baily on June 15, at a regular visit to go over taxes and the remodeling of Baily's residence. They also discussed the class Baily planned on attending the following week. During the period of June 15 *335 through June 24, defendant was working at Baily's home, clearing furniture from the downstairs unit so it could be rented. The items were to be sold at a garage sale. When she heard that Baily had missed some work during the weekend of June 18, she began covering for her by telling callers whatever came to mindthat Baily had a sore throat, was out of town, etc. She told one person, Minna Lieberman, that Baily had already left for the wedding in Salt Lake City in hopes that she would not bother Baily until after the wedding. She was afraid that Baily might be out binge drinking[10] or she thought that Baily might have decided to take another class.
During this period, she used Baily's checks and Costco card to make purchases. She had done this many times before, with Baily's knowledge. Baily would keep the receipt and write off the purchases on her taxes. The Costco items purchased before June 24 were in payment for defendant's work for Baily. She used two of Baily's checks on June 27, after her death, as a final payment for services she had rendered. She felt ashamed and threw away the remaining checks and the Costco card.
She purchased the charcoal lighter fluid on June 24 for both herself and Baily to use in their barbecues. The hose purchased at the same time was to replace defendant's broken hose. She did not use these items to start the fire at Baily's house.
Other witnesses called by the defense attested to Baily's drinking problem, her financial difficulties, her generosity with money, and her habit of overfilling her fireplace. One former tenant testified that she had once smelled smoke and went upstairs to investigate. She found Baily sitting in a dining room chair passed out, the fire's flames leaping up to the mantle. A former neighbor testified that Baily's prior tenant, Michael McGuire, when informed of the fire, swore that he was not responsible and had not been anywhere near the place. He then laughed and indicated that he was joking. Although McGuire was annoyed during a tenant dispute he had with the victim, he was not bitter about it. Another neighbor explained that he saw Baily a few weeks before the fire and asked why her car was parked several blocks away. Baily explained that her driveway was not large enough to accommodate her station wagon if she was loading or unloading it, so she parked further away.
An expert in fire investigations testified for the defense, indicating that there was no evidence of accelerant being used in the Baily fire. He said the official fire investigation in this case was inadequate and that the scene was not secured early enough. A lot of the debris was removed before the fire department could document it. He also testified that it was common for refrigerator doors to pop off during a fire and for shelves to fall out of refrigerators. The findings at the scene were consistent with an accidental cause.
Evidence offered by the defense established that Baily's property, worth about $90,000, went to Anne McPheeters. Baily's insurance proceeds ($182,000) went into her estate and were divided among her brother Richard Baily and Baily's eight nieces and nephews.

DISCUSSION

I.[**]

II.

The Trial Court Properly Denied Defendant's Request to Dismiss the Prosecution or Recuse the Prosecutor.

A. Error.
While defendant was in jail awaiting trial, the prosecutor asked jail personnel to *336 tape-record certain of her conversations. Specifically, he requested that outbound calls by defendant to Ann Argabrite and Philip Loyd, and all conversations between defendant and any nonattorney visitors, be recorded. This resulted in 31 cassette tapes containing recordings of some 85 telephone calls and 5 visits. None of the recordings contained conversations with defendant's attorney or the attorney's employees.
Defense counsel made a motion in the trial court either to recuse the district attorney or dismiss the case.[12] The trial court denied these requests. Defendant claims that this was error. She contends that the taping of these conversations violated her right to privacy under California law as articulated in De Lancie v. Superior Court (1982) 31 Cal.3d 865, 183 Cal.Rptr. 866, 647 P.2d 142 (De Lancie), and constituted prosecutorial misconduct amounting to a denial of due process which should have resulted in either recusal of the district attorney's office or dismissal of the action. We disagree.
De Lancie was the product of a civil complaint filed by a jail inmate, taxpayers, and a criminal defense attorney representing jail inmates, seeking injunctive and declaratory relief on the ground that county authorities were acting unlawfully by routinely recording jailhouse contacts without probable cause and "not ... for security purposes, but ... primarily to gather evidence for use in criminal trials." (31 Cal.3d at pp. 867, 869, 183 Cal.Rptr. 866, 647 P.2d 142.) The trial court sustained a demurrer and dismissed the action. A divided Supreme Court reversed, holding that the alleged practice violated a legislative policy, embodied in sections 2600 and 2601, under which "prisoners retain the rights of free persons, including the right of privacy, except to the extent that restrictions are necessary to insure the security of the prison and the protection of the public."[13] (Id. at p. 868, 183 Cal.Rptr. 866, 647 P.2d 142.) Although the statutes applied by their terms only to persons in state prison, the court held that "detainees in local jails as a matter of logical and constitutional necessity enjoy at least equal rights." (Ibid.) Accordingly, the plaintiffs stated a cause of action for equitable relief, and the trial court erred by dismissing their claims on demurrer. (Id. at p. 867, 183 Cal.Rptr. 866, 647 P.2d 142.)
The decision in De Lancie may well have raised more questions than it answered, including the nature and origin of the right protected, the extent to which it depends on the subjective expectations of prisoners and visitors, the extent to which it is subject to modification or abolition by legislative action, andof foremost importance herethe nature of the remedy, if any, to be granted by a trial court presiding over a criminal prosecution in which the prosecutor has recorded the defendant's conversations in violation of De Lancie.
Some of these questions were anticipated by members of the court in De Lancie itself. Thus Justice Richardson asserted that the majority opinion conflicted with "sounder decisions [which] have uniformly held, as a matter of law, that the practice of monitoring an inmate's conversations is (1) reasonably necessary to maintain jail security, and (2) that a person incarcerated in a jail or prison possesses no justifiable expectation of privacy. Accordingly, regardless of the jail officials' reason for monitoring a particular conversation, the practice is sensible, necessary and proper." (De Lancie v. Superior Court, supra, 31 *337 Cal.3d at p. 879, 183 Cal.Rptr. 866, 647 P.2d 142.)[14]
Justice Mosk also dissented, stating, "The concept of one purporting to enjoy privacy while he is under legally authorized supervision would appear to be a monumental anomaly. Nevertheless it is urged that whether such expectation can reasonably exist in the necessarily controlled environment of a jail depends upon the subjective beliefs of the participants.... [¶] ... [¶] It appears to me that there is a remarkably simple solution to the problem: there can be no reasonable expectation of privacy by anyone in a jailhouse if an adequate warning to the contrary is given. This can be accomplished by the posting of signs...." (De Lancie v. Superior Court, supra, 31 Cal.3d at p. 882, 183 Cal.Rptr. 866, 647 P.2d 142.) No decision known to us has addressed Justice Mosk's suggestion that a De Lancie violation can be averted by warning inmates that conversations may be monitored and recorded.
The issues left by De Lancie may deserve the attention of the Supreme Court, especially in light of recent statutory amendments. (See fn. 13, ante.) In the meantime, we are of course bound by the majority's decision in that case. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937; Trope v. Katz (1995) 11 Cal.4th 274, 287, 45 Cal.Rptr.2d 241, 902 P.2d 259.) However, that does not lead to the conclusion that any of the remedies sought by defendant for the violation of sections 2600 and 2601 is appropriate.
Respondent explicitly concedes that the recordings here were made at the request of the prosecution for the purpose of gathering evidence against defendant. In other words, the District Attorney of Alameda County defied the Supreme Court's holding in De Lancie. We emphatically condemn this behavior, which unquestionably constituted misconduct not only as a deliberate invasion of defendant's rights but as a threat to such structural guarantees as the separation of powers and the supremacy of the judiciary in determining what the law is. All attorneys are officers of the court, and the plain holdings of the Supreme Court may not be simply ignored by any attorney, least of all the public prosecutor, who is entrusted with the power and charged with the duty to vindicate the rule of law against those who would disregard it. We denounce in the strongest terms the conduct which occurred here.
Our condemnation of this practice, however, does not automatically translate into an acquittal, or even a new trial, for this defendant. The question is not only whether the prosecutor engaged in misconduct, but more fundamentally whether the trial court erred by failing to dismiss the case, recuse the district attorney's office, or order some other relief. Before addressing this question we must take note of what is not at issue.
Defense counsel all but conceded below that the recording of defendant's jailhouse conversations could not be viewed as an unreasonable search or seizure under the Fourth Amendment of the federal Constitution. Such a conclusion is compelled by the settled rule that under federal law "the secret monitoring and recording of unprivileged conversations in prisons, jails, and police stations [does] not constitute an unlawful search." (Donaldson v. Superior Court (1983) 35 Cal.3d 24, 27, 196 Cal.Rptr. 704, 672 P.2d 110; People v. Riel (2000) 22 Cal.4th 1153, 1184, 96 Cal.Rptr.2d 1, 998 P.2d 969.) Nor is there any suggestion of eavesdropping on privileged attorney-client communications in violation of the Sixth Amendment right to counsel, or conducting uncounseled interrogation through a police informant in violation of the Fifth and Sixth Amendments. (See Massiah v. United States (1964) 377 *338 U.S. 201, 206-207, 84 S.Ct. 1199, 12 L.Ed.2d 246 (Massiah); In re Neely (1993) 6 Cal.4th 901, 915, 919-920, 26 Cal. Rptr.2d 203, 864 P.2d 474.)
Our analysis is also bounded by the nature of the remedies sought by defendant, and arguably available to her. Most notably, while defense counsel argued below that the tapes should be excluded from evidence, that contention was not pressed in the briefs on appeal.[15] No known decision has ever held that a violation of De Lancie justifies exclusion of the evidence thus obtained. Earlier cases did not reach the issue because they held De Lancie not to be retroactive. (Donaldson v. Superior Court, supra, 35 Cal.3d at p. 28, 196 Cal. Rptr. 704, 672 P.2d 110; People v. Gallego (1990) 52 Cal.3d 115, 169, 276 Cal.Rptr. 679, 802 P.2d 169; People v. Carrera (1989) 49 Cal.3d 291, 326-327, 261 Cal. Rptr. 348, 777 P.2d 121; People v. Edelbacher (1989) 47 Cal.3d 983,1003-1004, 254 Cal.Rptr. 586, 766 P.2d 1; People v. Champion (1995) 9 Cal.4th 879, 911-912, 39 Cal. Rptr.2d 547, 891 P.2d 93.) Before the issue could be squarely presented, the voters adopted Proposition 8 (Cal. Const., art. I, § 28, subd. (d)), which prohibits the suppression of evidence except where it is compelled by federal authority. Courts since then have consistently held that because a violation of De Lancie offends no federal constitutional interest, it cannot warrant the exclusion of otherwise admissible evidence. (See People v. Riel, supra, 22 Cal.4th at p. 1184, 96 Cal.Rptr.2d 1, 998 P.2d 969; People v. Hines (1997) 15 Cal.4th 997, 1043, 64 Cal.Rptr.2d 594, 938 P.2d 388; People v. Plyler (1993) 18 Cal. App.4th 535, 544, 22 Cal.Rptr.2d 772 [citing numerous cases]; People v. Elwood (1988) 199 Cal.App.3d 1365, 1371-1372, 245 Cal.Rptr. 585; People v. Von Villas (1992) 11 Cal.App.4th 175, 219-220, 15 Cal. Rptr.2d 112.)
Defendant's only coherent theory of error is that the prosecutor's misconduct was such an egregious violation of her rights as to "shock the conscience" and effect a denial of due process under the federal Constitution. (Rochin v. California (1952) 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 [illegal entry, attempt to extract capsules from defendant's mouth, and forced stomach pumping warranted dismissal]; see People v. McIntire (1979) 23 Cal.3d 742, 748, fn. 1, 153 Cal.Rptr. 237, 591 P.2d 527 [police misconduct, if "sufficiently gross," could violate due process]; Morrow v. Superior Court (1994) 30 Cal. App.4th 1252, 1261, 36 Cal.Rptr.2d 210 (Morrow) [where prosecutor orchestrated investigator's eavesdropping on attorney-client conversation in courtroom area, "the court's conscience is shocked and dismissal is the appropriate remedy"].) We reject this contention.
While the prosecutor's conduct offends the structural constraints noted above, we do not believe the resulting invasion of defendant's rights can be held to be so egregious as to shock the conscience. No decision known to us has ever imposed sanctions in a criminal prosecution based on a violation of the rule in De Lancie. It is far from clear that such a violation infringes a constitutional right. It certainly has not been found to violate the Fourth Amendment of the federal Constitution. (See Donaldson v. Superior Court, *339 supra, 35 Cal.3d 24, at pp. 29-30, 196 Cal.Rptr. 704, 672 P.2d 110; People v. Riel, supra, 22 Cal.4th at p. 1184, 96 Cal. Rptr.2d 1, 998 P.2d 969.) Its status under California law is less clear. (See People v. Carrera, supra, 49 Cal.3d at p. 326, 261 Cal.Rptr. 348, 777 P.2d 121 [De Lancie recognized defendant's "statutory right of privacy"]; but see Donaldson v. Superior Court, supra, 35 Cal.3d at p. 35, 196 Cal. Rptr. 704, 672 P.2d 110 [stating in dictum that De Lancie rested at least in part on privacy guarantee of California Constitution, article I, section 1]; cf. People v. Crowson (1983) 33 Cal.3d 623, 629, 190 Cal.Rptr. 165, 660 P.2d 389, fn. omitted [federal search and seizure law and state privacy guarantee are "`coextensive when applied to police surveillance in the criminal context....'"; state privacy guarantee and Fourth Amendment apply only where parties to conversation have "`reasonable expectation of privacy'" with respect to what is said].) Notwithstanding De Lancie, courts in comparable contexts have continued to hold that occupants of a jailhouse and persons in similar custodial settings have no reasonable expectation of privacy in unprivileged communications. (See Sacramento County Deputy Sheriffs' Assn. v. County of Sacramento (1996) 51 Cal.App.4th 1468, 1487, 59 Cal.Rptr.2d 834 [videotaping of deputy sheriffs in nonprivate office on jail premises violated no privacy rights and gave rise to no tort claim because it involved no "`offensive'" conduct]; People v. Champion, supra, 9 Cal.4th at p. 912, 39 Cal.Rptr.2d 547, 891 P.2d 93, citing People v. Crowson, supra, 33 Cal.3d at p. 629, 190 Cal.Rptr. 165, 660 P.2d 389 [prisoners in police vehicles have no constitutional right to privacy, and recordings of their conversations are admissible]; cf. Donaldson v. Superior Court, supra, 35 Cal.3d at p. 36, 196 Cal.Rptr. 704, 672 P.2d 110; Ahmad A v. Superior Court (1989) 215 Cal.App.3d 528, 536, 263 Cal.Rptr. 747 [De Lancie "established the right of pretrial detainees to a reasonable expectation of privacy even within the confines of jail, [but] the statute does not provide for exclusion of evidence in the event law enforcement fails to honor that expectation"].)
Defendant places great emphasis on the rule that where the prosecution is guilty of misconduct, the prosecutor bears the burden of demonstrating that the misconduct neither prejudiced the defendant nor created a "substantial threat of demonstrable prejudice." (Morrow v. Superior Court, supra, 30 Cal.App.4th at p. 1258, 36 Cal.Rptr.2d 210, italics added.) Defendant asserts that the prosecutor failed to carry this burden. Again, we disagree. Although the prosecution undoubtedly bears the substantive burden of showing that its misconduct did not prejudice the defendant, a review of analogous cases establishes that where the content of the wrongfully obtained information is known to the defense, the defendant must point to some specific information capable of generating prejudice or a threat of prejudice.
In United States v. Morrison (1981) 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564, the Supreme Court assumed that law enforcement agents had violated the defendant's Sixth Amendment right to counsel. The court nonetheless held that the defendant was not entitled to dismissal of the indictment because she had "demonstrated no prejudice of any kind, either transitory or permanent, to the ability of her counsel to provide adequate representation in these criminal proceedings." (Id at p. 366, 101 S.Ct. 665.)
In People v. Lowery (1988) 200 Cal. App.3d 1207, 246 Cal.Rptr. 443, the defense moved for dismissal on the ground that authorities had recorded a conversation between the defendant and an accomplice-turned-informanta Sixth Amendment violation under Massiah, supra. In holding dismissal unwarranted, the court noted that the defendant had "made no attempt to demonstrate how he suffered any prejudice from the taping of his conversation.... Instead, he merely argues that such prejudice ought to be presumed. *340 In the light of Morrison we cannot agree. Absent demonstrable prejudice, or substantial threat thereof, dismissal of the information is plainly inappropriate." (Id, at p. 1228, 246 Cal.Rptr. 443; see id. at p. 1229, 246 Cal.Rptr. 443 ["Lowery has made no showing that the prosecutor made any use of the information he obtained from the tape, or that he failed to act in an evenhanded manner"].)
In People v. Memro (1995) 11 Cal.4th 786, 47 Cal.Rptr.2d 219, 905 P.2d 1305, the defendant moved to dismiss on the ground that deputies had seized, scrutinized, and lost certain papers generated by the defendant in preparing his defense. In affirming his conviction, the Supreme Court wrote: "[T]he [trial] court decided that even if there was intentional interference with th[e] right [to counsel], defendant had been able to show no prejudice. [¶] The ruling was sound.... [N]othing in the record suggests that attorney-client communications were revealed, and the prosecutor stated in his offer of proof that no information from the materials was known to, received by, or used to benefit the prosecution or the police." (Id, at p. 836, 47 Cal.Rptr.2d 219, 905 P.2d 1305, italics added.)
Similarly, in People v. White (1984) 161 Cal.App.3d 246, 249, 207 Cal.Rptr. 266, the court wrote: "It may be [that defendant] is attempting to analogize the present case to Prudhomme [v. Superior Court (1970) 2 Cal.3d 320, 85 Cal.Rptr. 129, 466 P.2d 673,] by implying [that] the prosecution might have discovered evidence on the tapes which aided in [defendants prosecution. This argument fails because [defendant] has not demonstrated a single instance of prosecutorial exploitation of matters on the tape. He has not shown [that] the tapes contained any evidence or evidentiary leads the prosecution could conceivably have used. The record does not demonstrate [that] any prosecution discovery, permissible or not, occurred as a result of the court order. [Citation.] [Fn. omitted.]" (Italics added.)
A different result was reached in Morrow v. Superior Court, supra, 30 Cal. App.4th at p. 1252, 36 Cal.Rptr.2d 210, but we believe that case is readily harmonized with the ones just described. The defendant there moved to dismiss upon discovering that a deputy district attorney had instructed her investigator to eavesdrop on a conversation between the defendant and his attorney in a holding area appurtenant to the courtroom. At the hearing on the motion the defense sought to question the offending deputy and investigator with respect to what they had overheard. They asserted the privilege against self-incrimination and refused to answer the defendant's questions. The trial court also refused to permit an in camera showing by the defense of what the investigator had overheard. The trial court nonetheless declared that there had been "no evidence that the investigator overheard any essential or strategic information." (Id. at p. 1258, 36 Cal.Rptr.2d 210.)
Not surprisingly, the court of appeal issued a writ of mandate directing the trial court to grant the motion. In doing so the court emphasized that the prosecution bore the burden of demonstrating the absence not only of prejudice but of a "substantial threat of demonstrable prejudice." (Id. at p. 1258, 36 Cal.Rptr.2d 210.) The prosecution had failed to carry that burden because "[b]ased upon the evidence presented or rather, the lack of it, [the trial] court could not have made a reliable finding as to what the investigator overheard. [¶] ... [¶] Where a prosecutor orchestrates courtroom eavesdropping on a privileged attorney-client communication and the witnesses thereto invoke the privilege against self-incrimination, the prosecution may not successfully oppose a motion to dismiss on the ground that no prejudice has been shown." (Ibid., italics added.)
The present case differs from Morrow in two critical respects. First, the prosecutor's conduct in Morrow was "`so outrageous as to interfere with [the defendant's] right of due process of law'" (id. at p. *341 1260, 36 Cal.Rptr.2d 210, quoting Boulas v. Superior Court (1986) 188 Cal.App.3d 422, 429, 233 Cal.Rptr. 487) and to "`shockt ] the conscience'" of the court (id. at p. 1263, 36 Cal.Rptr.2d 210, quoting Rochin v. California, supra, 342 U.S. at p. 172, 72 S.Ct. 205; see Morrow, supra, at p. 1261, 36 Cal.Rptr.2d 210). This conclusion flowed largely from the prosecutor's having "orchestrated" a deliberate invasion of the attorney-client privilege in the very heart of the "temple of justice." [16] (Id. at pp. 1258-1259, 1260, 1261, 36 Cal.Rptr.2d 210.) Here there was no infringement of Sixth Amendment interests, deliberate or otherwise; indeed, the prosecutor deliberately avoided any such infringement. Moreover the intercepted conversations took place not in the "temple of justice," but in a county jail, where outside the prescriptive rule of De Lancie, inmates have been uniformly held to have no reasonable expectation of privacy.[17]
Most critically, however, the present case differs from Morrow with respect to the state of the evidence and the showing made by the prosecution in response to the motion. In Morrow the only percipient witnesses to the invasionthe deputy district attorney and her investigator refused to testify or submit to cross-examination concerning the contents of the intercepted communications. The court even refused to receive an offer of proof from the defense concerning the conversation that was apparently overheard. Here, in contrast, the fruits of the misconduct were fully disclosed by the prosecutor's providing the tapes to the defense.
We agree with the Morrow court that under the circumstances shown there, the trial court could not find that the prosecution had carried its burden of establishing the absence of prejudice, because there had been a critical failure to proof as to what information had been gleaned through the misconduct. As a result, that issue had to be resolved in favor of the defense, such that the record was deemed to show "a `substantial threat of demonstrable prejudice' as a matter of law." (Id, *342 at p. 1261, 36 Cal.Rptr.2d 210.) Having failed to competently establish what it had learned, the prosecution could not be heard to challenge the sufficiency of the record to show prejudice. In effect, nondisclosure of the information obtained through misconduct required that prejudice be conclusively presumed.
This reasoning is readily harmonized with the other cases described above by a rule providing that, in cases of this kind, the prosecution must affirmatively establish the actual content of the information it has improperly acquired. If and when it makes that showing, however, the burden shifts to the defense to identify those features of the misconduct that the defendant contends inflict prejudice, or a threat of prejudice. The only apparent alternative to placing this burden on the defense is to require the prosecution to go through the intercepted information page by page, proffering an argument as to each why each line or sentence poses no substantial threat of prejudice. Even if the resulting burden on the prosecution might be defended as a sort of sanction, no such rationale could justify the burden such a procedure would inflict on the trial court, and on the judicial system as a whole. The present case amply illustrates the vice in such a regime: the prosecution would apparently have been required to go through all 31 tapes, parse each recorded conversation, and provide the trial court with some sort of annotation establishing the lack of potential prejudice as to each comment recorded. The trial court in turn would have been required to review this magnum opus and pass upon the success with which the prosecution had proven the negative on every point thus raised.
To describe such a procedure is to discredit it. It is far more in keeping with the experience of practical jurisprudence to require that once the prosecutor has disclosed the fruits of the misconduct, the burden shifts to the defendant to identify aspects or portions of the improperly obtained material that arguably pose a potential for prejudice. Only then can the trial court be expected to perform its adjudicatory function by determining whether the misconduct in fact inflicted prejudice or a substantial threat of demonstrable prejudice. Of course, the prosecution continues to bear the ultimate burden of persuasion on this issue, and the defense must be given an opportunity to test the completeness and accuracy of the prosecution's disclosure through cross-examination and such other procedures as may be appropriate under the circumstances. But once the prosecution has made full disclosure, the defense must come forward with some theory or specification as to how the misconduct has generated a risk of prejudice.[18] We believe that such a requirement is entirely consistent with Morrow and with all the other authorities we have reviewed.
Here the prosecution fully disclosed the fruits of its misconduct by making the tapes themselves available to the defense. It was then incumbent on defendant to identify some potential for prejudice with sufficient particularity to present an adjudicable issue. Instead, counsel merely asserted in the most general way that the intercepted information gave the prosecution insights into defense strategy, and into defendant's personality, that it could not otherwise have acquired. The defense did not direct the court to particular portions of the 31 tapes, or articulate any particular defense strategy of which the prosecution had learned, or identify anything in the tapes that might be used as ammunition in examining defendant or any *343 other witness. Although the defense never asked the trial court to review the tapes in their entirety, and never objected to its failure to do so, the implicit contention on appeal is that the court, with no guidance whatsoever as to what it was looking for, should have independently reviewed all 31 tapes and somehow decided whether the contents of the tapes presented a substantial threat of prejudice. That burden could not properly be cast upon the trial court.
It follows that the trial court did not err by denying defendant's motion to dismiss the prosecution or recuse the prosecutor's office based upon misconduct in the taping of defendant's jailhouse conversations.

B. Prejudice.

Defendant's failure to point to any specific potential for prejudice persisted in her briefs on appeal. Only at oral argument, and in supplemental briefing filed at our request, did the defense attempt to state with particularity what portion of the tapes posed a threat of prejudice. Our review of the tapes in response to this specification fails to establish any way in which they created any prejudice or substantial risk of potential prejudice to defendant. As a whole they seem devoid of information of potential use to the prosecution; indeed they are so riddled with red herrings and near-absurdities that one might consider them more likely to assist than harm the defense, if only in the time the prosecution would have wasted listening to them.
Counsel contends that certain portions of the tapes were prejudicial insofar as they were admitted in evidence. Only a small portion of the tape recordings was introduced at trial. Defendant's brother, Philip Loyd, was impeached with two recorded statements he made to defendant: (1) that "we could pin this on Alan [Breckstein]," and (2) that "I want to know where those fucking cops that interviewed you and I ... I want to talk to them again, okay, because we think that they were convinced by us."
Under a traditional privacy analysis it would seem at least arguable that defendant lacks standing to object to any privacy violation occasioned by the recording of statements by Philip Loyd. In any event, we fail to see how the admission of unprivileged material into evidence can be viewed as "prejudicial" for purposes of the rule gauging misconduct, when in the wake of Proposition 8, evidence secured by means of prosecutorial misconduct not rising to the level of a federal constitutional violation must be admitted. It follows that its admission (and any incriminating tendency which results) cannot be viewed as prejudicial for present purposes.
Counsel also identifies numerous passages from the tapes which, she contends, prejudiced defendant by allowing the prosecutor to hear her thoughts concerning the strengths and weaknesses of various potential trial strategies of both prosecution and defense. We have no doubt that such disclosures could prejudice a defendant where, for example, they disclosed information, such as a potentially effective defense theory or strategy, or evidence potentially helpful to the prosecution, of which the prosecution would not otherwise learn. The record here, however, fails to establish that the cited passages have this effect, either singly or collectively. For the most part they disclose only defendant's own impressions, opinions, and ruminations about the casematters that were unlikely to benefit the prosecution in any concrete way.
To be sure, a few of defendant's remarks might have hinted at possible defense strategies. However, the prosecutor was undoubtedly capable of anticipating possible defense strategies without defendant's assistance. The only way these conversations had any potential for prejudice was if they enabled the prosecution to prepare to meet actual defense strategies which it would not otherwise foresee. Far from suggesting any such thing, the tone of the conversations is rambling, discursive, and tentative. Indeed at one point appellant is overheard telling a friend that she and her attorney have divergent theories about what had happened to decedent *344 Baily. Appellant asserts that this conversation prejudiced her by alerting the prosecution to "possible disagreement between appellant and her attorney as to [the defense] theory of [the] case." But far from prejudicing appellant, such an alert would seem only to diminish the valuealready miniscule at bestof appellant's ruminations. The real prejudice would lie in alerting the prosecutor to something that was actually going to happen at trial. Simply ruminating about various possibilities seems as likely to lead the prosecution astray as to provide an accurate map.
Defendant also contends that the recordings posed a threat of giving the prosecutor valuable insights into her personality that would assist him in cross-examining her. This assertion goes beyond speculation to pure surmise. Defendant has never specified what particular insights might have been obtained. She is not excused from doing so by her assertion that the tape recordings are of a personal and sensitive nature. It is the duty of appellate counsel to refer the reviewing court to the portion of the record supporting an appellant's contentions on appeal; if no citation is furnished, the court may treat the point as waived. (9 Witkin, Cal. Procedure (4th ed.1997) Appeal, § 589, p. 624; Mansell v. Board of Administration (1994) 30 Cal.App.4th 539, 545, 35 Cal. Rptr.2d 574; Guthrey v. State of California (1998) 63 Cal.App.4th 1108, 1115, 75 Cal.Rptr.2d 27; see People v. Hyatt (1971) 18 Cal.App.3d 618, 624, 96 Cal.Rptr. 156 [where brief fails to specify the portions of the record supporting the appellant's factual assertions, the record is presumed to support the trial court's rulings].)
Given all of these considerations, we conclude that neither recusal of the district attorney nor dismissal of the charges was warranted as a result of the recording of defendant's unprivileged jail conversations.[19]

III.-V.[***]

CONCLUSION
The judgment is affirmed.
Concurring opinion of HANLON, P.J.
I reluctantly concur in the lead opinion. As noted in that opinion, a violation of De Lancie v. Superior Court (1982) 31 Cal.3d 865, 183 Cal.Rptr. 866, 647 P.2d 142 offends no federal constitutional interest and, therefore, cannot warrant the exclusion of this evidence under Proposition 8 (Cal. Const, art. I, § 28, subd. (d)). The continuation of this practice may result in a De Lancie suit for injunctive or other relief by similarly situated persons in custody awaiting trial in Alameda County. In the meantime, we are bound by our Supreme Court's decision under Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.
*345 POCHE, J.
I respectfully dissent from that portion of the lead opinion (part II) which concludes that the trial court properly denied defendant's motion to recuse the prosecutor or otherwise provide a remedy for the prosecutor's misconduct in ordering taping of defendant's telephone conversations made in clear violation of De Lancie v. Superior Court (1982) 31 Cal.3d 865, 183 Cal.Rptr. 866, 647 P.2d 142. Defendant contends, and I can only agree, that portions of the illegal tapes that were admitted into evidence at trial denied her due process of law.
Defendant was arrested on July 7, 1995, for the murder of Virginia Baily. While she was in custody from March 26 to June 30, 1996, certain of her telephone conversations and visits were tape recorded by jail personnel at the explicit direction of the prosecuting district attorney. The district attorney requested that all calls from the jail to defendant's brother Philip Loyd and to her friend Ann Argabrite be recorded. For the purpose of ruling on the motion the district attorney stipulated to the fact that his "purpose in taping the telephone ... conversations was to gather evidence which he hoped to use: [¶] 1. in the pending Virginia Baily case; [¶] 2. to gain an indictment from the Grand Jury and for the subsequent prosecution of Christine Loyd for the murder of her mother, Myrtle Loyd."
The taping continued after the prosecutor made his presentation to the grand jury in the later part of April. "During the course of several of these [taped] conversations" the prosecutor asserted, "defendant made damaging admissions which the People intend to introduce at trial."
The parties also stipulated that during the period of the recording there were no signs posted by the telephones warning that calls might be recorded. Likewise, evidence taken at the hearing on the motion established that the warning of possible taping normally given at the outset of telephone calls was temporarily deleted from the system by the service provider at the request of Alameda County. (See De Lancie v. Superior Court, supra, 31 Cal.3d at p. 882, 183 Cal.Rptr. 866, 647 P.2d 142 (dis. opn. of Mosk, J. [concluding that insofar as the majority relied upon an expectation of privacy, posted warnings to inmates would vitiate the reasonableness of any expectation of privacy inmates and their visitors might otherwise entertain].))
Defendant's motion was made in reliance upon De Lancie and upon a variety of other grounds.[1]De Lancie was a civil action for injunctive relief brought after it became public knowledge that jail personnel were routinely monitoring conversations in the San Mateo County jail between visitors and pretrial detainees. (Donaldson v. Superior Court (1983) 35 Cal.3d 24, 34, 196 Cal.Rptr. 704, 672 P.2d 110.) Plaintiffs alleged that such conversations were conducted in a visiting room through a glass barrier with the aid of a telephone intercom system that permitted the guards to monitor and record what was said. (De Lancie v. Superior Court, supra, 31 Cal.3d at p. 868, 183 Cal.Rptr. 866, 647 P.2d 142.) "In De Lancie we held that [Penal Code] sections 2600 and 2601 accord prison inmatesand, by necessary implication, jail detaineesa statutory right to privacy in prisons and jails that may not be abridged except `to provide for the reasonable security of the institution ... and for the reasonable protection of the public'" (People v. Crowson (1983) 33 Cal.3d 623, 630, 190 Cal.Rptr. 165, 660 P.2d 389.)
Defendant's motion in the case before us argued that the taping of her visits and phone calls was a violation of her statutory rights under the holding of De Lancie in *346 light of the fact that the taping was, as the prosecutor freely conceded, neither undertaken to promote institutional security nor to protect the publicthe legitimate penological interests which justify deprivation of a prisoner's rights under Penal Code section 2600. (De Lancie v. Superior Court, supra, 31 Cal.3d at p. 872, 183 Cal.Rptr. 866, 647 P.2d 142.)
She also sought relief on a number of additional grounds, the first of which was title III of the Omnibus Crime Control and Safe Streets Act of 1968. The act, which prohibits interception of telephone conversations, defines the prohibited conduct in such a way as to exclude from its ban communications intercepted by "an investigative or law enforcement officer in the ordinary course of his duties." (18 U.S.C. § 2510(5)(a); Bunnell v. Superior Court (1994) 21 Cal.App.4th 1811, 1818-1819, 26 Cal.Rptr.2d 819.) The contents of communications obtained in violation of the federal act may not be received in evidence in any federal or state trial. (18 U.S.C. § 2515.)
Evidence presented at the hearing by a Santa Rita jail officer established that these conversations were not intercepted in the sense that their contents were acquired (18 U.S.C. § 2510(4))as part of routine institutional monitoring for security purposes, but were preserved because tapes of calls to these individuals had been specifically sought by the district attorney. Moreover, the prosecutor stipulated on the motion that the purpose of the interception was "to gather evidence" and thereby gain the indictment of defendant and prosecute her for the murder of her mother. The existence of a law enforcement purpose, including the purpose of gathering evidence against a suspect, is not sufficient to bring taping of phone conversations within the law enforcement exception. (Bunnell v. Superior Court, supra, 21 Cal.App.4th at p. 1821, 26 Cal.Rptr.2d 819.)
Here neither institutional security or protection of the public was advanced in justification of the interceptionboth of which I take to be encompassed within those "legitimate penological interests" presently described by Penal Code section 2600. Moreover, such taping cannot be within the ordinary course of a law enforcement officer's duties when absent a legitimate penological interest such taping is, as our Supreme Court has concluded, a violation of a detainee's statutory rights.
In opposition to defendant's motion the prosecutor maintained first that the motion was in essence a motion to exclude evidence under a Fourth Amendment expectation of privacy analysis. The expectation of privacy rationale upon which many of the California cases have relied in applying De Lancie is irrelevant to telephone calls intercepted by a wiretap illegal under the federal statute because such calls are protected regardless of the reasonableness of the speakers' expectations of privacy. (People v. Otto (1992) 2 Cal.4th 1088, 1098-1099, fn. 7, 9 Cal.Rptr.2d 596, 831 P.2d 1178.) Accordingly, the analysis urged by the prosecutor was relevant under the federal act only to tapes of visits, but not to the taped telephone calls. Because the taped evidence, which the lead opinion concludes cannot have been prejudicial, is a long-distance telephone call defendant made to her brother Philip Loyd, it is clearly a call subject to the provisions of the federal act for which exclusion from evidence is required.
When it appears that the People have engaged in misconductfor openers: knowingly violating the law as announced by the highest court of this state and also engaging in conduct prohibited by federal statutethe burden rests upon the People to prove, by a preponderance of the evidence, that sanctions are unwarranted because defendant was not prejudiced by the misconduct. (People v. Zapien (1993) 4 Cal.4th 929, 967, 17 Cal.Rptr.2d 122, 846 P.2d 704.) Defendant sought recusal of the prosecutor and exclusion of the tapes. Here, because the trial court failed to rule that the illicit taping of defendant's phone calls constituted misconduct in flagrant *347 disregard of De Lancie, or to find that the federal act required their exclusion from evidence, the court imposed no sanction whatsoever. As defendant predicted, the prosecutor's illicit tapes once in evidence came to infect the trial as a whole.
At the hearing on the motion the prosecutor insisted there had been no De Lancie violation or violation of Penal Code section 2600. Beyond that he argued that there was no remedy for a violation of De Lancie: "De Lancie simply has no application in a criminal proceeding."
Perhaps the prosecutor was correct when he concluded there was no remedy in a criminal context for a violation of De Lancie. That is certainly the result reached by the lead opinion. Much as it bemoans the behavior of the prosecutor, after much admonitory handwringing it concludes that all relevant evidence is admissible (Cal. Const., art. I, § 28(d)), ergo how that evidence was obtained is beyond the purview of the trial court. Such a result, however, overlooks the nature of the prosecutor's conduct here which defendant specifically attacked as constituting misconduct that threatened her due process right to a fair trial.
Defendant's fears were indeed well founded. During the prosecutor's case-in-chief he called her brother Philip Loyd. Philip was asked if they hadn't discussed the fact that only defendant had had access to their mother's apartmenta crucial issue since apparently Myrtle Loyd's body was found inside a locked apartment. "Didn't you say to her, specifically, `We could pin this on Alan [Breckstein]'?" A moment or so later the prosecutor again asked: "At one point, did you tell her, `We could pin this on Alan, we could pin this on Alan'?" The following day the "pin this on Alan" portion of the taped conversation was played for the jury.
The prosecutor then impeached Philip Loyd with another statement he made somewhat later in the same conversation. After asking Philip about an interview he and defendant had had in their mother's apartment with investigating police officers, the prosecutor asked: "Did you state specifically: [¶] `I want to know where those fucking cops that interviewed you and I, where are those guys ... I want to talk to them again, okay, because we think that they were convinced by us.'" Again the tape of the telephone call was played for the jury.
Philip Loyd was clearly a witness hostile to the prosecutor. He testified unequivocally that he believed his mother's death to have been accidental and that his sister was incapable of having killed his mother. Therefore by using the illicitly taped jailhouse conversations the prosecution could effectively discredit him as being at least an unwitting participant in defendant's attempt to concoct alternative scenarios which would shift suspicion from her.
The prosecutor also used the jailhouse tape to bolster his argument that a overly hasty investigation at the time of Myrtle Loyd's death was largely a product of defendant's insistence to the officers that her mother must have had a stroke or accident in the bathroom. Thus, in final argument the prosecutor returned twice to Philip Loyd's comment about the "`Fucking cops that interviewed you and I.... Because we think that they were convinced by us.'"
In closing the prosecutor repeatedly returned to Philip Loyd's "`Let's pin this on Alan'" comment. However, the value of the "let's pin this on Alan" conversation to the prosecutor was not simply to cast doubt on Philip Loyd's judgment, and by implication his belief in his sister's innocence, but to illustrate the People's theory that defendant is a depraved sociopath who manipulates others into believing her concocted version of events. Accordingly, the prosecutor argued to the jury that once Philip mentioned that the People were going to argue that defendant had a key to her mother's apartment, defendant "knows the implication of her being the only one that had access. She's going to try and pin it on Alan." Thus when defendant *348 suggested to Philip, "`I think Alan had a key.' ... [¶] She's thinking `I can sell Alan as being the killer.'"
The prejudice to the defense from the illicit jailhouse tapes was considerable. The tapes permitted the prosecutor to play conversations between defendant and her brother in which they seemed to be concocting patently false scenarios to explain away the defendant's opportunity to commit the crime. The tapes also permitted the prosecutor to suggest that Myrtle Loyd's death was initially treated as an accident in large measure because defendant was a convincing liar who manipulated a lazy police officer into accepting her false tale of accidental death.
As the prosecutor argued to the jury, "The jail tapes showed no ifs, ands or buts." The essence of the prosecutor's case being that only defendant had the motive, the access and the opportunity to kill Myrtle Loyd. Seen in this light the taped conversation suggested that defendant was guiltyfirst of her mother's death and secondof a cover-up of the crime through a subtle process of inducing her brother and the police to believe a false version of events to explain away her access to the house and thus her opportunity to commit the crime. By using the illicit jailhouse tape of defendant's conversation with Philip Loyd, the prosecutor effectively bolstered what was a purely circumstantial case with statements from the mouth of defendant herself which in the prosecutor's view showed her in the very process of planting the seeds of a fictional defense in the mind of her brother, Myrtle Loyd's other child and one of defendant's staunchest defenders.
The full impact of the taped conversations between defendant and Philip Loyd was felt only during the prosecutor's closing argument. Admittedly, defense counsel did not object during argument, though it is beyond my ken how an objection at that juncture could be other than futile or a jury admonition other than ineffective. (People v. Arias (1996) 13 Cal.4th 92, 159, 51 Cal.Rptr.2d 770, 913 P.2d 980.) Once the evidence was admitted the prosecutor could appropriately draw inferences from it consistent with his theory of the case.
The remedies available to the defense by then were extremely limited, although competent counsel might well have moved for mistrial as to the case involving Myrtle Loyd. Based on my reading of this record and the prejudice to defendant caused by the admission of the illicitly taped phone conversation with Philip Loyd I would reverse defendant's conviction for the murder of her mother, regardless of whether we measure the prejudice under People v. Watson (1956) 46 Cal.2d 818, 299 P.2d 243 or under Chapman v. California (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. (See People v. Otto, supra, 2 Cal.4th at p. 1116, fn. 19, 9 Cal.Rptr.2d 596, 831 P.2d 1178.) Upon any retrial I would exclude from evidence the taped telephone conversations.
Further, as a sanction upon the Alameda County District Attorney for willfully ordering this taping in open defiance of state and federal statutes and controlling authority from our state Supreme Court, I would require Alameda County to bear the full cost of any retrial. It is an affront not only to the rights of this defendant but to the long tradition of integrity of the office of the Alameda County District Attorney for a prosecutor to willfully ignore the dictates of the law on the basis that he or she can ignore it with impunity to gain a conviction. There may no longer be a remedy for certain violations of De Lancie, but there are certainly remedies in a criminal action for such flagrant prosecutorial misconduct, not to speak of injunctive relief available in a civil action.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, III, IV, and V.
[1] All further references are to the Penal Code unless otherwise indicated.
[2] The day before the autopsy was performed, the defendant told Gerald Kedik, a friend of her mother's, that it looked like the decedent had had a stroke and fallen in the tub. Defendant also said it appeared that her mother had tried to get up and had fallen again a couple of times, hitting her head on the faucets.
[3] The defendant told her mother's bosses, Bowles and Wark, that when she found her mother there was blood everywhere.
[4] The witness testified that a woman 5 feet 5 inches tall weighing 140 pounds could fit inside; evidence showed that Baily weighed over 165 pounds.
[5] This caller indicated that previously no one had ever answered the telephone at Baily's residence other than Baily herself. The defendant returned messages left at Baily's house during this period before the fire. Another witness testified that she had never known anyone other than Baily herself to return messages left there.
[6] Several items were missing from the victim's home after the fire, including a large solid oak dining room table, an 18-piece set of kitchen knives, and a set of heavy metal pot hangers. These items were apparently taken by the defendant and her boyfriend for a garage sale.
[7] Jane Timberlake was a friend of Baily's, who had previously lent Baily $11,000. Timberlake's daughter Anne McPheeters was a joint tenant on Baily's house. Anne was the daughter of Baily's ex-husband Woody McPheeters. Anne had lived with Baily and Woody McPheeters from the age of six to the age of thirteen years and Baily was fond of her. She wanted Anne McPheeters to receive the house upon her death.
[8] Madison and McLaren lived next door to Baily.
[9] Alan Breckstein had been Myrtle Loyd's hairdresser. He and his domestic partner, Gerald Kedik, were friends of the deceased; they had lived in the same apartment building until 1988. Breckstein died before the trial of this matter. Kedik testified that Breckstein never mentioned getting any calls about Myrtle Loyd on the weekend in question, although a telephone log did show a call from the place where the defendant was staying in St. Helena to their residence on Friday, July 19. Neither he nor Breckstein had a key to Myrtle Loyd's apartment.
[10] Friends of Baily testified that she had a drinking problem that became more severe over time, and caused blackouts.
[**] See footnote *, ante.
[12] At the hearing on the motion, defense counsel also suggested suppression of the evidence as a possible sanction.
[13] Section 2601 originally guaranteed specific civil rights including the right to personal visits. (Former § 2601, subd. (d).) Effective January 1, 1997, the statute was amended to eliminate the entitlement to personal visits. (Stats.1996, ch. 132, § 1, p. 541.)
[14] Testimony at the hearing below supported a finding that although the recordings here were made for the purpose of gathering evidence, they served the interests of, even if they were not strictly necessary for, institutional security.
[15] In a postargument letter brief defendant cites a number of cases in apparent support of the proposition that suppression of the tapes would be an appropriate remedy. All but one of these decisions were rendered by federal courts, and presumably involved the violation of federal constitutional rights. The lone California case is People v. Quartermain (1997) 16 Cal.4th 600, 66 Cal.Rptr.2d 609, 941 P.2d 788. That case, however, involved the admission of statements made by the defendant, during a meeting with the prosecutor, under an explicit agreement between the prosecutor and defense counsel that nothing the defendant said could be used at trial. The Supreme Court held that the prosecutor's violation of this agreement offended the due process guarantee of fundamental fairness. (Id. at pp. 618-621, 66 Cal.Rptr.2d 609, 941 P.2d 788.) Nothing comparable to those facts is presented here.
[16] As in Morrow, other cases imposing sanctions based on prosecutorial interception of defense communications seem to involve direct invasions of attorney-client privilege. Thus in People v. Garewal (1985) 173 Cal. App.3d 285, 218 Cal.Rptr. 690, the entire district attorney's office was recused after a prosecutor read part of an interview between the defendant and his attorney's investigator. In People v. Zapien (1993) 4 Cal.4th 929, 17 Cal.Rptr.2d 122, 846 P.2d 704, the district attorney removed the deputy originally assigned to the case after a prosecution investigator under the deputy's supervision destroyed an audiotape containing defense counsel's strategy notes. In that case the court found neither dismissal nor recusal of the elected district attorney warranted.

Consistent with the distinction suggested by this common theme, the court in People v. White, supra, 161 Cal.App.3d 246, 207 Cal. Rptr. 266, seemed to imply that dismissal might be categorically unavailable as a remedy where a De Lancie violation did not invade the attorney-client privilege. The court observed that the defendant "sought a remedy, dismissal, to which he was entitled only in the most limited circumstances not applicable here.... Interference with the attorney-client relationship may entitle a defendant to a dismissal [citations], but [the defendant] never even attempted to demonstrate any attorney or legal conversations were taped. (White, supra, 161 Cal.App.3d at p. 252, 207 Cal.Rptr. 266.) These comments may have been unnecessary to the decision, because the court also found De Lancie inapplicable due to lack of retroactivity and the existence of an independent purpose for the recording, i.e., to protect a witness. Nonetheless they support an argument that where no privileged communications are intercepted, dismissal is improper.
[17] The Morrow court also deemed it proper to consider the appropriateness of dismissal in light of other factors including "the nature of the crime charged [and] the fact that petitioner has been incarcerated for approximately one year awaiting trial...." (Id. at p. 1263, fn. 4, 36 Cal.Rptr.2d 210.) The court apparently reasoned that the interest of society in punishing defendant for an alleged burglary had already been sufficiently served by his preconviction time in custody and that the interest in vindicating the rule of law against outrageous prosecutorial misconduct should therefore prevail. It is difficult to imagine how this rationale could be applied to support dismissal of multiple murder charges.
[18] Of course, placing this burden on the defense assumes that the prejudicial potential of the information is not obvious, either because its relevance to the case is inapparent or because the information is so voluminous that the relevant portions may be buried. Where the potential for prejudice is self-evident, the defense does not forfeit its challenge merely by failing to recite what is, or should be, obvious to all. This, however, was not such a case.
[19] Our dissenting colleague suggests that the tapes should have been excluded under the authority of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520. Although the Act was cited in defendant's moving papers below, defendant placed no particular emphasis on it and never specifically informed the trial court that it might supply authorization to exclude the tapes. Defendant points out on petition for rehearing that she did mention the Act once in her briefs on appealbut this was merely a passing reference in a footnote; it operated only as a description of proceedings in the trial court; it referred to the Act only by common name, without title or section number; and the Act was omitted entirely from the table of authorities. This insignificant allusion hardly sufficed to raise the issue of the Act's potential application to defendant's case. In any event, as indicated in the text, we do not believe the brief portions of tape admitted at trial were prejudicial to defendant, given the totality of the evidence adduced at trial and the minor role played by the tapes in the prosecuting attorney's argument to the jury.
[***] See footnote *, ante.
[1] The written motion contended that the taping of defendant's phone calls and visits was also prohibited by: title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2511; the privacy provision of our state Constitution (Cal. Const, art. I, § 1); the rights accorded a criminal defendant to avoid self-incrimination (Cal. Const., art. I, § 15; U.S. Const., 5th Amend.) to have the assistance of counsel (Cal. Const., art. I, § 15; U.S. Const., 6th Amend.); and her right to due process (Cal Const., art. I, § 7; U.S. Const., 5th & 14th Amends.)